2005 OK CR 22

**Karl Lee MYERS, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. PCD 2002–978.**

Court of Criminal Appeals of Oklahoma.

Nov. 17, 2005.

Bryan L. Dupler, Wyndi Thomas–Hobbs, Oklahoma Indigent Defense System, Capital Post–Conviction Division, Norman, OK, attorneys for defendant/appellant at trial on mental retardation and appeal.

Ray Hasselman, Edith Singer, Assistant District Attorneys, Rogers County Courthouse, Claremore, OK, attorneys for the State at the trial on mental retardation.

Laura M. Arledge, Oklahoma Indigent Defense System, Capital Post–Conviction Division, Norman, OK, attorney for appellant on appeal.

No State response on appeal.

## OPINION DENYING POST–CONVICTION RELIEF AFTER MENTAL RETARDATION TRIAL

A. JOHNSON, J.

¶ 1 Karl Lee Myers was tried by jury in the District Court of Rogers County, Case No. CF–96–233, and was convicted of First Degree Murder for the death of Cindy Marzano.[1] The jury found the existence of four aggravating circumstances, concluded that the aggravating circumstances outweighed the mitigating evidence and sentenced Myers to death. This Court affirmed Myers's Judgment and Sentence in *Myers v. State,* 2000 OK CR 25, 17 P.3d 1021, and the United States Supreme Court denied Myers's petition for writ of certiorari in *Myers v. Oklahoma,* 534 U.S. 900, 122 S.Ct. 228, 151 L.Ed.2d 163 (2001).

¶ 2 Myers thereafter filed an initial application for post-conviction relief which was denied in an unpublished opinion. *Myers v.*

---

1. Myers was also convicted of First Degree Murder in a separate trial in Rogers County District Court, Case No. CF–96–233, for the death of Shawn Williams. Myers's appeal in that matter is currently pending before this Court in Case No. D–2000–271.

*State,* Case No. PCD–2000–516 (Okl.Cr.2001). On November 4, 2002, Myers filed a second application for post-conviction relief, raising, among other issues, an *Atkins*[2] claim that he could not be executed because he was mentally retarded. On January 27, 2003, we ordered the State to respond to Myers's *Atkins* claim. On August 1, 2003 following receipt of the State's response, this Court issued an order denying in part and granting in part Myers's second post-conviction application. We remanded this matter to the District Court of Rogers County for an evidentiary hearing on the issue of Myers's mental retardation to determine if there was sufficient evidence of mental retardation to entitle Myers to a jury trial on the issue.

¶ 3 Myers's evidentiary hearing was held October 27–28, 2003 in the District Court of Rogers County before the Honorable Dynda Post, District Judge. Judge Post submitted Findings of Fact to this Court on November 12, 2003, concluding that Myers had presented sufficient admissible evidence to create a fact question on the issue of mental retardation, requiring a jury trial to resolve the factual issue pursuant to *Murphy v. State,* 2002 OK CR 32, ¶ 39, 54 P.3d 556, 568–70 (hereinafter *Murphy I* ).[3] Thereafter, Myers filed a brief urging this Court to adopt Judge Post's findings.[4] After reviewing the evidence we too found that Myers had presented sufficient evidence of mental retardation and we remanded the matter back to the

District Court of Rogers County for a jury trial on that factual issue.

¶ 4 On August 30, 2004, Judge Post impaneled a jury to hear Myers's claim of mental retardation. At the conclusion of the ten-day mental retardation trial, the jury found that Myers was not mentally retarded. On October 4, 2004, Judge Post filed her Findings of Fact and Conclusions of Law with this Court, concluding that the jury's verdict was supported by the evidence and was not influenced by passion, prejudice or any arbitrary factor. The district court record, trial court transcripts and exhibits were filed with the Clerk of this Court on October 27, 2004. On January 18, 2005, Myers filed a supplemental brief raising four claims of error.[5]

¶ 5 Though this appeal remains part of Myers's post-conviction case, errors alleged to have occurred during his jury trial on mental retardation will be reviewed in the same manner as errors raised on direct appeal from a trial on the merits. We review Myers's fourth claim first. In Proposition IV, Myers contends that the jury's verdict was contrary to the evidence, and that the facts established at trial show that he is mentally retarded. He argues therefore that to carry out his death sentence would constitute cruel and unusual punishment. *See Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

¶ 6 A defendant must prove mental retardation by a preponderance of the evi-

---

2. *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) (holding execution of the mentally retarded constitutes cruel and unusual punishment in violation of the Eighth Amendment.)

3. The *Murphy I* court adopted the following definition of "mentally retarded" for capital sentencing purposes:

   A person is "mentally retarded": (1) If he or she functions at a significantly sub-average intellectual level that substantially limits his or her ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; (2) The mental retardation manifested itself before the age of eighteen (18); and (3) The mental retardation is accompanied by significant limitations in adaptive

functioning in at least two of the following skill areas: communication; self-care; social/interpersonal skills; home living; self-direction; academics; health and safety; use of community resources; and work.
*Murphy I,* 2002 OK CR 32, ¶ 31, 54 P.3d at 567–68.

In addition to the above three part definition, *Murphy I* also requires that a petitioner have at least one full-scale I.Q. test score of 70 or below at some point in time in order to be "eligible to be considered mentally retarded." *Murphy I,* 2002 OK CR 32, ¶ 31, 54 P.3d at 568.

4. The State did not file a brief in this matter despite being granted the opportunity to submit a supplemental brief within twenty (20) days of the filing of the district court's Findings of Fact.

5. Again, the State filed no response.

dence.[6] *State, ex rel. Lane v. Bass,* 2004 OK CR 14, ¶8, 87 P.3d 629, 631–32; *Lambert v. State,* 2003 OK CR 11, ¶4, 71 P.3d 30, 32. He must show: 1) that he functions at a significantly sub-average intellectual level that substantially limits his ability to understand and process information, to communicate, to learn from experience or mistakes, to engage in logical reasoning, to control impulses, and to understand the reactions of others; 2) that his mental retardation manifested itself before the age of 18; and 3) that he has significant limitations in adaptive functioning in at least two of the nine listed skill

areas.[7] *Murphy I,* 2002 OK CR 32, ¶31, 54 P.3d at 567–68. The jury weighs the evidence presented by the defendant and by the state and determines whether the defendant has met his burden of proof that he is mentally retarded. If the jury finds that the defendant is not mentally retarded, as it did in this case, the death sentence stands. *See Lambert,* 2003 OK CR 11, ¶4, 71 P.3d at 32.

¶7 Whether a person is mentally retarded is a question of fact.[8] In evaluating questions of fact decided by a jury we give great deference to the jury's finding. We

---

6. The majority of states where the death penalty is an option utilize this same standard. Arkansas—Ark. Code Ann. § 5–4–618(c) (2004); California—Cal. Penal Code § 1376(b)(3) (2005); Idaho—Idaho Code § 19–2515A(3) (2004); Illinois—Ill. Comp. Stat. ch. 725 § 5/114–15(b) (2004); Louisiana—La. Code Crim. Proc. art. 905.5.1(C)(1) (2004); Maryland—Md. Code, Crim. Law § 2–202(b)(2)(ii) (2004); Missouri—Mo. Rev. St. § 565.030(4)(1) (2005); Nebraska—Neb. Rev. Stat. § 28–105.01(4) (2004); Nevada—Nev. Rev. St. 174.098(5)(b) (2004); New Mexico—N.M. Stat. Ann. § 31–20A–2.1(C) (2005); New York—N.Y.Crim. Proc. § 400.27(12)(a) (2004), *held unconstitutional on other grounds in People v. LaValle,* 3 N.Y.3d 88, 783 N.Y.S.2d 485, 817 N.E.2d 341 (2004); South Dakota—S.D. Codified Laws § 23A–27A–26.3 (2004); Tennessee—Tenn. Code Ann. § 39–13–203(c) (2004); Utah—Utah Code Ann. § 77–15a–104(12)(a) (2004); Virginia—Va. Code Ann. § 19.2–264.3:1.1(C) (2004); Washington—Wash. Rev.Code § 10.95.030(2) (2005); Mississippi—*Russell v. State,* 849 So.2d 95, 148 (Miss.2003); Ohio—*State v. Lott,* 97 Ohio St.3d 303, 779 N.E.2d 1011, 1015 (Ohio 2002); Pennsylvania—*Commonwealth v. Mitchell,* 576 Pa. 258, 839 A.2d 202, 211 n. 8 (Pa.2003); South Carolina—*Franklin v. Maynard,* 356 S.C. 276, 588 S.E.2d 604, 606 (S.C.2003); Texas—*Ex Parte Briseno,* 135 S.W.3d 1, 12 (Tex.Crim.App.2004).

7. To pursue an *Atkins* claim and be eligible to be considered mentally retarded for capital sentencing purposes, a defendant must have a scientifically recognized, scientifically approved and contemporary full scale I.Q. test score of 70 or below. *Murphy I,* 2002 OK CR 32, ¶31, 54 P.3d at 567–68. Myers met this threshold burden when he presented evidence of mental retardation in the District Court and it found that he had full scale I.Q. test scores of 70 or below from proper tests and sufficient evidence to present a question of fact on the *Murphy I* three part definition of mental retardation. We agreed and remanded the matter for this jury trial on mental retardation.

8. *See Murphy I,* 2002 OK CR 32, ¶39, 54 P.3d at 570 ("the District Judge shall determine if Petitioner has raised sufficient evidence ... of his mental retardation ... for the issue of mental retardation to be decided as a question of fact by a jury...."); *Martinez v. State,* 2003 OK CR 25, ¶10, 80 P.3d 142, 144 ("Where a fact question is found, a jury then steps in to determine the [mental retardation] issue ...."); *see also Snow v. State,* 2004 OK CR 10, ¶9, 87 P.3d 626, 628 (despite trial court's finding, after an evidentiary hearing, that the petitioner did not raise sufficient evidence to establish a question of fact of mental retardation, this Court remanded for a jury determination to resolve the fact question regarding mental retardation); *Pickens v. State,* 2003 OK CR 16, ¶11, 74 P.3d 601, 604 and *Lambert v. State,* 2003 OK CR 11, ¶2, 71 P.3d at 31 (the petitioner raised sufficient evidence to create a question of fact on the issue of mental retardation, so this Court remanded for a jury determination on this issue.).

Other states have reached the same conclusion. *See Perkinson v. State,* 279 Ga. 232, 610 S.E.2d 533, 537–38 (2005)(Where disputed, the issue of mental retardation is a fact question for the jury.); *In re Hawthorne,* 35 Cal.4th 40, 24 Cal.Rptr.3d 189, 105 P.3d 552, 558 (2005)(Mental retardation is a question of fact.)(Citing, among other cases, *Murphy I.*); *Burns v. Warden,* 269 Va. 351, 609 S.E.2d 608, 610 (2005)(If the appellate court finds the mental retardation claim is not frivolous it must remand the "factual issue" of mental retardation to the trial court for determination.); *State v. Flores,* 135 N.M. 759, 93 P.3d 1264, 1266 (2004); *Atkins v. Commonwealth,* 266 Va. 73, 581 S.E.2d 514, 516 (2003); *State v. Lott,* 97 Ohio St.3d 303, 779 N.E.2d 1011, 1014 (2002)("Whether Lott is mentally retarded is a disputed factual issue...."); *Stallworth v. State,* 868 So.2d 1128, 1180 (Ala.Crim.App.2001)(Defendant did not produce sufficient evidence to raise a question of fact on mental retardation.). *But see State v. Dunn,* 831 So.2d 862, 887 (La.2002)("This factual/legal determination must be made following a hearing during which the court will be guided by evaluation and diagnosis made by those with expertise in diagnosing mental retardation.").

will not disturb the jury verdict where there is any competent evidence reasonably tending to support it. *See Johnson v. State*, 2004 OK CR 23, ¶ 10, 93 P.3d 41, 44–45. When the defendant challenges the sufficiency of the evidence following a jury finding that he is not mentally retarded, this Court will review the evidence in the light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion. *Id.*[9]

■ ¶ 8 Applying this standard of review to the present case, we find the record supports the jury's verdict that Myers is not mentally retarded. Myers intellectual ability has been tested throughout his life by use of full-scale I.Q. (F.S.I.Q.) tests, intelligence-screening tests, and partial I.Q. tests. His scores on these various tests ranged from 66 to 88.[10] His scores on F.S.I.Q. tests ranged

9. Courts which have announced a standard of review in deciding whether a capital defendant is mentally retarded, give deference to the factual findings of lower tribunals. Only one of these jurisdictions, Georgia, has announced a standard of review in determining a jury determination of mental retardation. The Georgia Supreme Court, on direct appeal, reviews the evidence in the light most favorable to the state and determines whether a rational trier of fact could have found that the defendant failed to meet the burden of proving his mental retardation at the time of the crime. *See Pittman v. State*, 269 Ga. 419, 499 S.E.2d 62, 63 (1998). It appears that Maryland would use the same standard, but the case is unclear. *See Richardson v. State*, 89 Md.App. 259, 598 A.2d 1, 5, n. 6 (1991)("there was abundant evidence, including appellant's own testimony, from which a fact finder might have concluded that his 'adaptive behavior' was not 'impaired' ...").

Other jurisdictions, stating a standard, have judges making the decision and give deference to the trial court's factual findings. In California, death post-conviction mental retardation issues are reviewed using habeas corpus procedures. *See In re Hawthorne*, 24 Cal.Rptr.3d 189, 105 P.3d at 558–559 (2005). When remanded for evidentiary hearings, factual findings are entitled to great weight when supported by substantial evidence. *In re Lucas*, 33 Cal.4th 682, 16 Cal. Rptr.3d 331, 94 P.3d 477, 483 (2004)("findings of fact, though not binding, are entitled to great weight when supported by substantial evidence."). On direct habeas review or direct appeal, the court reviews the whole record in the light most favorable to the judgment or order below, and conflicts in the evidence must be resolved in favor of the People. *People v. Torres*, 218 Cal.App.3d 700, 705, 267 Cal.Rptr. 213, 215 (1990).

The 4th Circuit Court of Appeals gives deference to the fact finder and reviews the trial court's findings of fact for clear error. *United States v. Roane*, 378 F.3d 382, 395 (4th Cir.2004). In Tennessee the Supreme Court would use an "abuse of discretion" standard when evaluating a trial court's finding. *See Howell v. State*, 151 S.W.3d 450, 456 n. 3 (Tenn.2004)(commenting that the "abuse of discretion" standard would be used).

In Alabama and Texas, the appellate court reviews a trial court's findings for an abuse of discretion. *See Morrow v. State*, —— So.2d ——,

2004 WL 1909275, at *6 (Ala.Crim.App.2004)(utilizing a "rule 32" post-conviction procedure, the court gives deference to the factual findings of the trial court); *State v. Gause*, 892 So.2d 458, 460 (Ala.Crim.App.2004); and *Ex Parte Briseno*, 135 S.W.3d 1, 12–13 (Tex. Crim.App.2004)("We defer to the trial court's factual findings underlying his recommendation when they are supported by the record. Thus, we afford almost total deference to a trial judge's determination of the historical facts supported by the record, especially when those fact-findings are based on an evaluation of credibility and demeanor. However, if the trial court's ruling is not supported by the record, this Court may reject the findings.").

The Florida Supreme Court gives deference to the trial court's finding of fact. *See Bottoson v. State*, 813 So.2d 31, 33–34 & n. 3 (Fla.2002)(giving deference to trial court's credibility evaluations and finding the trial court's determination of no mental retardation was supported by the record). The Arkansas Supreme Court reviews a trial court's pre-trial finding that a defendant is not mentally retarded, and affirms the determination if it is supported by substantial evidence. *Rankin v. State*, 329 Ark. 379, 948 S.W.2d 397, 403 (1997).

10. Myers's testing began when he was around six years old. In 1954, he scored a 73 full scale I.Q. on the Stanford–Binet test, but three years later, in 1957, he scored a 66 full scale I.Q. on the same test. Over ten years later, Myers completed two intelligence-screening tests, scoring a 79 in 1969 and an 88 in 1971.

In 1973, Myers scored a 75 full scale I.Q. on the Wechsler Adult Intelligence Scale-revised (WAIS–R) given at the Osawatomie State Hospital in Kansas. In this test, he scored a 64 on verbal I.Q. and a 93 on performance I.Q.

One year later, in 1974, Myers scored an 87 on another intelligence-screening test. While incarcerated in Oklahoma, in 1977, Myers scored a 77 on the verbal portion of an I.Q. test given at Eastern State Hospital in Oklahoma.

In 1999, Myers scored a 77 full scale I.Q. on the WAIS–R given by Dr. Phillip Murphy, Ph.D. However, the results of this test are questionable because the WAIS–R was obsolete at the time Murphy administered it. The WAIS–R was last revised in 1981 and the WAIS–R III was released

from a low of 66 to a high of 77.[11] His only F.S.I.Q. test scores below seventy occurred once in 1957 and twice in preparation for this litigation of his mental retardation claim. In the district court Myers relied, in part, on these three test scores to show that he functioned at a significantly sub-average intellectual level. The jury, however, was also entitled to consider Myers's test scores above seventy and conclude that he functioned at the higher level. Further, I.Q. tests alone are not determinative of the issue of mental retardation. *Murphy I*, 2002 OK CR 32, ¶ 31, 54 P.3d at 568.

¶ 9 Other evidence supports the finding that Myers failed to prove by a preponderance of the evidence that he functioned at a significantly sub-average intellectual level and that he had significant adaptive functioning limitations in communication, academics and use of community resources as he alleged.[12] Many witnesses, both lay and expert, testified about Myers's functional ability and his adaptive functioning. These witnesses established that Myers had held a regular job as a truck driver, and had successfully passed the test for a commercial driver's license allowing him to drive a tractor-trailer rig. He had also worked as a forklift operator in a warehouse, loading and unloading trucks based on bills of lading. That job required him to complete classroom training, proficiency training and pass a written test in order to drive the forklift. He was also able to do some work as a mechanic and worked for a time in an automotive shop. While in prison, Myers learned to read simple material and earned a certificate showing he had learned to weld and fabricate metal.

¶ 10 Myers lived by himself and was able to maintain his home and take care of himself and several animals. Myers assisted in the care of his wife as she was dying of cancer. He was capable enough to follow directions and retrieve needed medication and supplies. After his wife died, Myers managed his own financial affairs, including refinancing his property.

¶ 11 Myers was able to effectively communicate with people. He was able to socialize with acquaintances without difficulty. Myers could understand others, make himself understood, express his wishes and understand the reactions of others. He was able to plan for future events. He was able to mislead people and, when confronted with inconsistencies in his stories, he could conform his story to fit the facts. And there was evidence that Myers negotiated his own grant of immunity with a sheriff in Kansas for a crime he committed there. This record does not support a finding that Myers functions at a significantly sub-average intellectual level or that he suffers from deficits in adaptive functioning. We, therefore, find that any rational jury could have concluded Myers was not mentally retarded as defined in *Murphy I*.

¶ 12 We now turn to Myers's other propositions of error.[13] In Proposition I, Myers claims that the district court's instruction that mental retardation must be "present and known" before age 18 violates *Atkins*. Myers argues that the "present and

in 1997. The WAIS–R III was the standard in the field at the time Murphy administered its outdated predecessor.

Two experts tested Myers's F.S.I.Q. in preparation for the litigation of his mental retardation claim. In 2002, Myers scored a 66 full scale I.Q. on the Wechsler Adult Intelligence Scale 3rd edition (WAIS–III) given by his expert, Dr. Ray Hand, Ph.D, and in 2004, Myers scored a 69 on the same test given by Dr. John Call, the State's expert. During this time Myers also took a brief form I.Q. test administered by Dr. Nancy Cowardin. On this test, he scored in a range between 67–69.

11. Myers argues that his F.S.I.Q. scores above 70 were influenced by the "Flynn effect." The "Flynn effect" theory states that results on any given I.Q. test will rise approximately 3 points for every 10 years that the test is in existence.

12. Myers met the second *Murphy* requirement that his condition manifested itself before the age of 18. He presented evidence that a treating physician, who treated him for a broken thumb when he was ten years old, noted an impression of "mental retardation" on his chart. Myers also presented evidence that teachers and other children noticed and made remarks that he was unlike normal children and functioned at a lower level. Myers also had a F.S.I.Q. test score of 66 when he was around six years old.

13. Propositions I, II and III are raised in a conclusory manner with bare citations to the record and case law, but without analysis.

known" language creates a higher burden than the "manifests" language used in *Murphy I*. Myers's counsel objected to the district court giving the instruction adopted in *Murphy I*, now known as OUJI–CR 2d 4–68A (2003 Supp.). Myers proposed the district court drop the "present and known" language in the instruction and substitute "originates before age 18." The district court overruled the objection, denied the request, and gave the instruction adopted by this Court in *Murphy I*. We will not disturb the district court's ruling here unless an abuse of discretion is shown. *Williams v. State*, 2001 OK CR 9, ¶ 22, 22 P.3d 702, 711.

¶ 13 Jury instructions are sufficient if, when read as a whole, they state the applicable law. *McGregor v. State*, 1994 OK CR 71, ¶ 23, 885 P.2d 1366, 1380. As used in this context, the word "manifest" is a transitive verb and the word "known" is an adjective. The *Random House Unabridged Dictionary* defines "known" as perceived or understood as fact or truth; apprehended clearly and with certainty. *See* "know" & "known" *Random House Dictionary* (2nd ed.1997). It defines "manifest" as "to make clear or evident to the eye or the understanding; show plainly … to prove; put beyond doubt or question." *See* "manifest" *Random House Dictionary* (2nd ed.1997).

¶ 14 We find that the words "present and known" are words of common everyday understanding that do not require a level of proof above that required to prove that a condition "manifested" itself. "Known" as it relates to the jury instruction used in this case does not require a scientific finding or a medical diagnosis. *See Murphy I*, 2002 OK CR 32, ¶ 31 n. 19, 54 P.3d at 567 n. 19. The retardation has only to have been perceived or recognized by someone before the defendant reached the age of 18. The court's instruction accurately stated the applicable law and therefore we find that the district court did not abuse its discretion in giving this uniform instruction.

¶ 15 In Proposition II, Myers claims that the district court erred by denying his request to submit non-unanimous verdict forms to the jury. At trial, defense counsel objected to the uniform instructions and verdict forms requiring the jury to return a unanimous verdict. Counsel proposed advising the jury that it could return a non-unanimous verdict and providing it with non-unanimous verdict forms. The district court overruled the objection, denied the request and used the verdict forms adopted in *Lambert*.

¶ 16 Requiring a unanimous verdict on the issue of mental retardation does not violate *Atkins, Murphy I*, or *Lambert*. It neither increases the likelihood that a mentally retarded person will be executed nor does it force jurors to vote for a particular position. A unanimous decision is also required by our state constitution in all criminal cases other than misdemeanors. Okla. Const. art. II, § 19.[14] *Lambert* provides a procedure for a jury that cannot unanimously agree that a defendant is mentally retarded. In that instance, the benefit of the doubt goes to the defendant and the district court resentences the defendant to life imprisonment without the possibility of parole. *Lambert*, 2003 OK CR 11, ¶ 5, 71 P.3d at 32. Nothing in *Atkins, Murphy I or Lambert* requires the jury to be told what happens if it cannot reach a unanimous verdict. This claim is denied.

¶ 17 In Proposition III, Myers claims that the district court erred by denying his motion to quash the venire and change venue. At the start of jury selection, Myers moved for a change of venue arguing he could not receive a fair mental retardation trial in Rogers County because of the extensive media coverage of his previous two capital murder trials. The district court denied the motion and advised Myers to renew the motion should there be evidence of juror bias based on media coverage during jury selection. Myers did renew his motion several times during jury selection arguing that the questioning of jurors about the previous publicity surrounding his murder cases and the number of jurors stating that they knew

---

**14.** Section 19 provides in part, "In civil cases, and in criminal cases less than felonies, three-fourths (3/4) of the whole number of jurors concurring shall have power to render a verdict. In all other cases the entire number of jurors must concur to render a verdict."

something about them tainted the entire jury pool. The district court overruled Myers's motions to quash the venire and change venue each time he renewed them. Myers asserts that the district court abused its discretion because the court's repeated denial of his motions deprived him of a fair trial with a fair and impartial jury.[15]

¶ 18 In reviewing this claim on appeal, we evaluate the totality of the circumstances surrounding Myers's mental retardation trial to determine whether Myers was tried before a fair and impartial jury.[16] *DeRosa v. State*, 2004 OK CR 19, ¶ 20, 89 P.3d 1124, 1135. On appeal this Court focuses not on the jurors who might have been impaneled, but on the jurors who actually were impaneled. *DeRosa*, 2004 OK CR 19, ¶ 21, 89 P.3d at 1135. We review the record to see if the jurors before whom Myers's claim of mental retardation was tried were able to lay aside any prior knowledge or opinions regarding the case, and render a verdict based upon the evidence presented in court. "Because evaluation of juror impartiality is a factual inquiry, based largely upon numerous credibility determinations, this Court will not reverse a denial of a change of venue motion absent a showing of abuse of discretion by the trial court." *Id.* at 1135–36.

¶ 19 The record shows the district court conducted extensive voir dire of prospective jurors regarding their prior knowledge of Myers's cases. Nine potential jurors were removed for cause because they had some prior knowledge. Further, one juror was removed during the trial because she remembered something about the murder cases while listening to the testimony of Mark Marzano, the husband of murder victim Cindy Marzano. None of the jurors who deliberated stated they had any prior knowledge about Myers's murder charges.

¶ 20 "The Sixth Amendment right to a jury trial guarantees to the criminally accused a fair trial by a panel of impartial jurors." *DeRosa*, 2004 OK CR 19, ¶ 17, 89

P.3d. at 1134, *citing Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). The *Irvin* court stated:

> It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases.

*Irvin*, 366 U.S. at 722–23, 81 S.Ct. at 1642.

¶ 21 The record shows the district court carefully conducted jury selection to avoid tainting the entire venire. At no time were the details of the crimes revealed to the potential jurors through the jury selection process. Questions were carefully tailored so that those potential jurors who had prior knowledge could say so without revealing the specific information. The district court exercised extreme care to ensure that those prospective jurors who had prior knowledge did not infect the venire and did not serve. Myers has not shown that the jurors seated in his case were not fair and impartial. Accordingly, we find that the district court did not abuse its discretion in failing to quash the venire and change venue in this case. *See DeRosa*, 2004 OK CR 19, ¶ 33, 89 P.3d. at 1139–40. No relief is required.

### DECISION

¶ 22 The jury's verdict is factually substantiated. We **AFFIRM** the finding that Myers is not mentally retarded as defined in *Murphy I*. Further, we find that Myers's other claims of error do not justify relief. Myers's application for post-conviction relief is **DENIED**. Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2005), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

---

15. The district court noted on the record that less than ten percent of the entire "jury pool" had prior knowledge of the case.

16. Myers does not contend that his case is one of the rare cases where media influence was so pervasive and prejudicial that prejudice must be presumed. *See DeRosa*, 2004 OK CR 19, ¶ 19, ¶ 22, 89 P.3d at 1135–36.

CHAPEL, P.J., C. JOHNSON and LEWIS, JJ: concur.

LUMPKIN, V.P.J.: specially concur.

LUMPKIN, Vice Presiding Judge: Specially Concur.

¶1 The issue of mental retardation has proven to be particularly challenging for this Court in its review of capital and capital post-conviction appeals. However, Judge Arlene Johnson has provided a thorough and scholarly analysis of that issue as it applies in this case,[1] and in so doing has helped the Court resolve several sticky issues in our mental retardation jurisprudence.

¶2 First and foremost, this case sets forth the all-important standard of review this Court will use on appeal when a defendant challenges the sufficiency of the evidence following a jury finding that he or she is not mentally retarded. That is, "[w]hen the defendant challenges the sufficiency of the evidence following a jury finding that he is not mentally retarded, this Court will review the evidence in the light most favorable to the State to determine if any rational trier of fact could have reached the same conclusion."

¶3 This standard of review, with which I wholeheartedly agree, establishes an objective test that will enable the District Courts and litigants to understand the applicable law and respond accordingly. Moreover, the standard gives proper deference to jury determinations on the issue at hand and is consistent with the standard of review for sufficiency of the evidence announced by the United States Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), as applied throughout the years by this Court in *Spuehler v. State*, 1985 OK CR 132, ¶7, 709 P.2d 202, 203–04 and cases decided thereafter.

¶4 This standard is not *de novo* review, where we would look at the entirety of the evidence objectively and then weigh which side made the stronger case.[2] Rather, in situations where a jury has rejected a mental retardation claim, we give the evidence of the prevailing party, in this case the State, the benefit of the doubt wherever that evidence is truly in conflict.[3] Unless it is one of those rare situations where we can say a rational juror could *not* have drawn this conclusion from this evidence, the jury's determination must be upheld. And, I must state that absent a showing of passion or prejudice in the decision making process, those situations should be "hens tooth" rare. As the Court's order states, "In evaluating questions of fact decided by a jury we give great deference to the jury's finding. We will not disturb the jury verdict where there is any competent evidence reasonably tending to support it." [4]

1. This case arises from Petitioner's second post-conviction application in which he raised a mental retardation claim under *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) and *Murphy v. State*, 2002 OK CR 32, 54 P.3d 556. This Court first remanded for an evidentiary hearing and, following that, a jury trial on the mental retardation issue. Under normal circumstances, when this Court remands a matter for an evidentiary hearing under our Post–Conviction Relief Act, the hearing is solely for the purpose of developing an evidentiary record on the issues of ineffective assistance of counsel or actual innocence. In the limited category of cases where the issue of mental retardation arose in post-conviction, however, the hearing is for the purpose of determining if Petitioner was deprived of the opportunity to have a jury in his or her original trial decide the issue of mental retardation.

2. Indeed, as *Jackson v. Virginia* explained, the court does not "ask itself" what *it* believes. 443 U.S. at 319, 99 S.Ct. at 2789. Rather, the Court asks whether "any rational trier of fact could have found" as the jury did, when viewing the evidence in the light most favorable to the prevailing party. *Id.* "This familiar standard gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id.*

3. This is in line with presumptions we routinely make, like that of regularity of the proceedings, of a jury following its instruction, of constitutionality of a law enacted, and of counsel's conduct falling within a wide range of reasonableness.

4. My sincere hope is that this Court will take these words seriously and exercise judicial restraint when reviewing jury verdicts on the issue of mental retardation. *Atkins v. Virginia* acknowledged a national consensus against the execution of the mentally retarded. However, "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." *Atkins v. Virginia*, 536 U.S. at 317, 122 S.Ct. at 2250. In

¶ 5 Secondly, in applying that standard of review to the facts, the order in this case correctly observes, "The jury, however, was also entitled to consider Myers's test scores above seventy and conclude that he functioned at the higher level." Thus, the case recognizes that Myers presents one of those difficult mental retardation cases, with conflicting evidence placing him either at the very top of the mildly mentally retarded range or, more likely, solidly in the borderline intelligence range. Here, jurors thoughtfully considered the evidence presented and reached the understandable decision that Myers is not mentally retarded.

¶ 6 This decision is consistent with *Atkins v. Virginia*, which described mental retardation as a "disabilit[y]" or "impairment" of reasoning, judgment, and impulse control. 536 U.S. at 307, 122 S.Ct. at 2244. Quoting from the American Psychiatric Association, the Supreme Court explained that mental retardation is a "final common pathway of various pathological processes that affect the functioning of the central nervous system," the onset of which "must occur before age 18 years." *Id.*, 536 U.S. at 308, n. 3, 122 S.Ct. at 2245. Mental retardation is, therefore, a cognitive defect that begins manifesting at a very young age and is irreversible.

¶ 7 But Myers had wildly fluctuating IQ scores, a 22–point difference with the low at 66 and the high at 88. This is odd, and not at all consistent with the reality of someone who had a lifelong disability in the functioning of his central nervous system. A truly mentally retarded person will not have IQ scores that bounce back and forth over so broad a spectrum.[5] And while IQ tests are

not alone determinative, the defendant's numerous IQ scores in a range that would not even qualify him to be in the mild mentally retarded range is strong evidence that he is not mentally retarded.

¶ 8 Third, *Myers* acknowledges that defendants have the threshold burden of producing *at least one* acceptable IQ test score of 70 or below. It doesn't figure in a "margin of error," which would effectively raise that threshold. A margin of error in IQ scoring doesn't require the 70 threshold set forth in *Murphy* and this case to be raised. It simply means a defendant with a borderline IQ may need to take the test several times. If a defendant cannot produce *at least* one IQ test showing the defendant operating *at least* within the mild mentally retarded range, then there is no way he is going to be able to prove he is mentally retarded at trial. More importantly, he is not a person who *is* mentally retarded, although he may have some learning disabilities or other types of problems.

¶ 9 And finally, I admire the spirit and tone of this decision. It honors the concept of *stare decisis* and wisely builds on our prior cases, rather than attacking them. Our cases dealing with the issue of mental retardation should be about applying the law, not personal opinions about the death penalty.

other words, a line must be drawn somewhere. The difficult job of sorting through the facts and determining who is and who is not mentally retarded will ultimately fall upon properly instructed jurors, not five judges. And it stands to reason that the greatest challenges jurors will face in that regard will be to evaluate those individuals with IQs that place them in the "mild" mentally retarded range or just above. *See id.*, 536 U.S. at 308, n. 3, 122 S.Ct. at 2245 (" 'Mild' mental retardation is typically used to describe people with an IQ level of 50–55 to approximately 70.") I anticipate that members of the Court will not always personally agree with the jury's determination, but under the standard of review the Court adopts today, we must accept their decision so long as there is any

competent evidence reasonably tending to support it. No one would want a Court that claims to adopt one standard of review but then applies a lesser standard, say *de novo* review, whenever a majority of the Court disagrees with the trier of fact's difficult decision.

5. Indeed, DSM–IV–TR at 42 indicates that when there is a significant scatter in IQ test scores, a profile of strengths and weaknesses, rather than the mathematically derived IQ score, will more accurately reflect one's learning abilities. In other words, a great fluctuation in IQ scores indicates something is not right, and should be *ipso facta* evidence the person is not mentally retarded.