RANDOLPH, Presiding Justice,
specially concurring:
¶ 89. I have carefully weighed Presiding Justice Dickinson’s call for a judicial overhaul of defining intellectual disability (formerly mental retardation) to include those persons having “reduced intellectual functioning” or “any mental defect or disease,” (Dickinson Op. at ¶ 121), with the majority’s urge for conformance with es *36 tablished precedent. I conclude that both the mea eulpa[6] of Justice Dickinson and the categorization of Atkins as confusing (Dickinson Op. at ¶ 101) are ill-founded and based upon a false premise, that the mental-health community has “no responsibility” for the definition of an intellectual disability definition. (Dickinson Op. at ¶ 117). Articles and position statements published by mental-health professionals and their member organizations clearly dispute such a conclusion.
¶ 90. The American Association of Intellectual and Developmental Disabilities (AAIDD)[7] has stated, “[w]hen death penalty is an issue, individuals with intellectual disability[8] ... must ... continue to be exempt from the death penalty because existing case-by-case determinations of competence to stand trial, criminal responsibility, and mitigating factors at sentencing have proved insufficient to protect the rights of individuals with intellectual disability;” Criminal Justice System, at www.aaidd.org/news-policy/policy/position-statements/criminal-justice (emphasis added) (last visited June 16, 2015). The AAIDD supports the Atkins[9] decision, noting that its amicus brief was cited by the Court “in support of its ruling that the Constitution protects all defendants with intellectual disability.” Intellectual Disability and the Death Penalty, at www. aaidd.org/news-policy/news/article/2013/10/ 23/intellectual-disability-and-the-death-penalty (last visited June 16, 2015).
¶ 91. “Intellectual disability” is more than just a label; it is a diagnosis which can be made only by a mental-health professional. Comparing Justice Dickinson’s suggested instruction with the guidelines set forth by the mental-health professions and adopted by Atkins evidences an expansion to include “any' mental defect or disease,” coupled with an unspecified “reduced intellectual functioning,” without any recognized standard. (Dickinson Op. at ¶. 121). Mental-health professionals devote their life’s work to studying and understanding diagnostic criteria of intellectual disability and in es *37 tablishing a standard for its diagnoses. Defining and establishing those standards is for mental-health professionals. The judiciary is ill-equipped to tinker with the established mental-health professionals’ diagnostic criteria. We interpret laws. Following the law as it stands today, there is no trial-court error.
¶ 92. The standard articulated by the United States Supreme Court in Atkins and adopted by this Court in Chase[10] is spot on. Atkins and Chase do not protect all persons with mental defects or diseases, only those who meet the clinical definition of intellectual disability. Today’s majority recognizes that the United States Supreme Court and this Court have adopted and continuously applied the definition of “mental retardation,” now referred to as “intellectual disability,” as,set forth by the American Association on Mental Retardation (AAMR) and the American Psychiatric Association (APA):
The American Association on Mental Retardation (AAMR) defines mental retardation as follows: “Mental retardation refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18.” Mental Retardation: Definition, Classification, and Systems of Supports 5 (9th ed.1992).
The American Psychiatric Association’s definition is similar: “The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use . of community resources, self-direction, functional acar demic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C). Mental Retardation has many different etiologies and may be seen as a final ■ common pathway of various pathological processes that affect the functioning of the central nervous system.” Diagnostic and Statistical Manual of Mental Disorders 41 (4th ed.2000). “Mild” mental retardation is typically used to describe people with an IQ level of 50-55 to approximately 70. Id., at 42-43.
Atkins, 536 U.S. at 308, 122 S.Ct. at 2245 n. 3. See also Foster v. State, 848 So.2d 172, 174 (Miss.2003); Russell v. State, 849 So.2d 95, 146 (Miss.2003); Chase, 873 So.2d at 1027-28; Lynch v. State, 951 So.2d 549, 558-59 (Miss.2007). No cases or legislative acts can be found which would dispute the following conclusion:
A state would be on firm ground if it adopted either the AAMR or the APA definition of mental retardation, or if it combined the two.' Today, there is very little controversy about the concept and definition of mental retardation.
Richard J. Bonnie[11] & Katherine Gustaf-son, The Challenge of Implementing Atkins v. Virginia: Hotv Legislatures and *38 Courts Can Promote Accurate Assessments and Adjudications of Mental Retardation in Death Penalty Cases, 41 U. Rich. L.Rev. 811, 821 (May 2007).
¶ 93. Furthermore, Hall v. Florida, - U.S. -, 134 S.Ct. 1986, 188 L.Ed.2d 1007 (2014), the most recent pronouncement from the United States Supreme Court affirming Atkins, addresses the hypothetical posited by Justice Dickinson. In Hall, the United States Supreme Court held that states’ discretion to define intellectual disability for Eighth Amendment purposes is not unlimited. Hall, 134 S.Ct. at 1998. The Supreme Court also directed that the states lack “unfettered discretion to define the full scope of the constitutional protection” and that “Atkins provide[s] substantial guidance on the definition of intellectual disability.” Hall, 134 S.Ct. at 1998-99. Hall also recognized the significant role of the medical and mental-health communities in informing legal determinations of intellectual disability:
That this Court, state courts, and state legislatures consult and are informed by the work of medical experts in determining intellectual disability is unsurprising. Those professionals use their learning and skills to study and consider the consequences of the classification schemes they devise in the diagnosis of pfersons with mental or psychiatric disorders or disabilities. Society relies upon medical and professional expertise to define, and explain how to diagnose the mental condition at issue. And the definition of intellectual disability by skilled .professionals has implications far beyond the confines of the death penalty: for it is relevant to education, access to social programs, and medical treatment plans. In determining who qualifies as intellectually disabled, it is proper to consult the medical community’s opinions.
Id. at 1993.
¶ 94. The United States Supreme Court did not place too great a burden on states regarding capital punishment. Atkins left only implementation to the States.[12]
Although the Supreme Court in Atkins left it to the states to enforce the new constitutional rule, Atkins did not leave each state free to define mental retardation. As already ■ indicated, it seems clear that the Supreme Court intended for the states to embrace a clinical definition of mental retardation, as a diagnosable disorder, rather than a legally constructed definition focusing on functional impairments and bearing on diminished culpability. The Court set out, in full, two well-established clinical definitions of mental retardation, one from the American Association on Mental Retardation (AAMR) and one from the American Psychiatric Association (APA). Although the language of these two definitions differs somewhat, they are conceptually identical, requiring significant deficits in intellectual functioning and adaptive behavior and onset before age eighteen.
Bonnie and Gustafson, The Challenge of Implementing Atkins v. Virginia, 41 U. Rich. L.Rev. at 818-19.
*39 ¶ 95. In Virginia, its legislature “chose to use the AAMR definition as their model primarily because the AAMR is the principal professional organization in the field of mental retardation. Its definition is highly respected and also reflects the most current research in the field.” Bonnie and Gustafson, The Challenge of Implementing Atkins v. Virginia, 41 U. Rich. L.Rev. at 821.
The diagnosis of mental retardation always involves significant clinical judgment, and thus, the Virginia statute correctly emphasizes conformity with standards of practice generally accepted by the field. The IQ test chosen to be administered must be a “standardized measure generally accepted by the field of psychological testing,” and the testing process must be “carried out in conformity with accepted professional practice.” These requirements should ensure fan* assessments of defendants and reliable results that courts can use with confidence.
By embracing a clinical definition of mental retardation, the United States Supreme Court put professional standards of measurement, assessment, and diagnosis at the center of Atkins adjudications. Fair implementation of Atkins requires states to take appropriate steps to ensure that these assessments are held to high standards of quality. States should go to great lengths at all levels-in statutory provisions, administrative guidelines, and in the training of judges, experts, and other court personnel-to ensure that capital defendants are evaluated fairly and accurately.
Id. at 825-26.
¶ 96. In the present case, Dickerson did not present sufficient evidence to support the jury instruction requested. Therefore, there was no trial-court error as to this issue.
WALLER, C.J., LAMAR, CHANDLER, PIERCE AND COLEMAN, JJ., JOIN THIS OPINION.

. Justice Dickinson claims responsibility for the nonexistent ambiguity in the application of Atkins. (Dickinson Op. at ¶ 101). He cites a case note, written prior to his penning Chase v. State, 873 So.2d 1013 (Miss.2004), which claims, inter alia, that the "capital punishment jurisprudence ... has become ... a morass.” See Dickinson Op. at ¶ 100. The cases relied upon by the unknown author of this note are all pre-Atkins cases. This note, while penned at a prestigious university, is not authoritative, as evidenced by its misstatements of the Atkins holding: "Although the Court discussed several characteristics of the mentally retarded that make death an especially unsuitable punishment, it refrained from endorsing any particular definition of mental retardation....” .Note, Implementing Atkins, 116 Harv. L.Rev. 2565 (2003).

. The AAIDD was formerly known as the American Association on Mental Retardation (AAMR), and. the American Association on Mental Deficiency (AAMD).

. " 'People with intellectual disability (ID)’ refers to those with 'significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before age 18,' ". as defined by the American Association on Intellectual and Developmental Disabilities (AAIDD) in its manual, Intellectual Disability: Definition, Classification, and Systems of Supports (Schalock et al., 2010), and the Diagnostic and Statistical Manual of Mental Disorders, 5th Edition (DSM-5), published by the American Psychiatric Association (APA, 2013).” Criminal Justice System, at www.aaidd.org/news-policy/ policy/position-statements/criminal-justice (last visited June 16, 2015). The AAIDD supports the modem terminology of ID and urges courts to follow the United States Supreme Court’s lead in adopting this new terminology- U

. Atkins v. Virginia, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002).

. Chase v. State, 873 So.2d 1013 (Miss.2004).

. Bonnie is the Harrison Foundation Professor of Law and Medicine, Professor of Public Policy, Professor of Psychiatry and Neurobe-havioral Science, and Director of the Institute of Law, Psychiatry and Public Policy at the University of Virginia. Among other public service appointments, he was asked by the Chief Justice of the Virginia Supreme Court to chair a Commission on Mental -Health Law Reform.

. Although many states' legislatures enacted legislation consistent with Atkins, Mississippi, along with six other states, has adopted Atkins into the common law in the absence of a state statute. See Myers v. State, 130 P.3d 262, 266 (Okla.Crim.App.2005); Commonwealth v. Miller, 585 Pa. 144, 888 A.2d 624, 630-31 (2005); Ex parte Briseno, 135 S.W.3d 1, 17-18 (Tex.Crim.App.2004); Franklin v. Maynard, 356 S.C 276, 588 S.E.2d 604, 605 (S.C.2003); Ex parte Perkins, 851 So.2d 453, 455-56 (Ala.2002); and State v. Lott, 97 Ohio St.3d 303, 779 N.E.2d 1011, 1014-15 (2002). All seven courts adopted language tracking the definitions of mental retardation/mental disability propounded by the AAMR and/or the APA: (1) significantly sub-average intelligence, (2) significant or substantial deficits in adaptive behavior, (3) manifested prior to age eighteen.