2006 OK CR 12

**Karl Lee MYERS, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. D 2000–271.**

Court of Criminal Appeals of Oklahoma.

April 4, 2006.

318

David Autry, Capital Trial Division, Indigent Defense System, Norman, OK, attorney for defendant at trial.

Gene Haynes, District Attorney, Ray Hasselman, Assistant District Attorney, Rogers County Courthouse, Claremore, OK, attorneys for the State at trial.

Emma Victoria Rolls, Appellate Defense Counsel, Lee Ann Jones Peters, Deputy Division Chief, Indigent Defense System, Norman, OK, attorneys for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, David M. Brockman, Assistant Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## OPINION

C. JOHNSON, Judge:

¶ 1 Appellant, Karl Lee Myers, was tried in Rogers County District Court, Case No. CF 96–233, for First Degree Murder, with malice aforethought, and/or in the alternative, First Degree Murder, while in the commission of a felony based upon the underlying felony of rape by force or fear, in violation of 21 O.S.1991, § 701.7(A) or § 701.7(B).[1] Jury trial was held before the Honorable Dynda Post, District Judge, on January 25, 2000 through February 16, 2000. The jury found Appellant guilty of First Degree Murder while in the commission of a felony. The jury also found the existence of four (4) aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the Defendant was previously convicted of a felony involving the use or threat of violence; (3) the existence of a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society; and, (4) the murder was committed for the purpose of avoiding arrest or preventing a lawful arrest or prosecution. The jury set punishment at death. The trial court imposed Judgment and Sentence on March 7, 2000, in accordance with the jury's verdict. Thereafter, Myers perfected this appeal.[2]

1. The State originally charged Appellant with two (2) counts of First Degree Murder. (O.R.1–3, 37–40) The trial court later severed the charges. Count II was tried separately to a jury in 1998 and the jury set punishment at death. We affirmed Appellant's conviction and sentence of death in that case. *See Myers v. State*, 17 P.3d 1021, 2000 OK CR 25 (hereafter referred to as *Myers I* ).

2. Myers filed his Petition in Error on September 6, 2000. On August 8, 2001, Myers filed his Brief in Chief, an Application for Evidentiary Hearing on Sixth Amendment Claims, and Notice of Extra Record Evidence Supporting Appellant's Proposition of Error Referencing the Execution of the Mentally Retarded. The State filed its Answer on December 6, 2001, and Myers filed a Reply Brief on December 26, 2001. Oral argument was held on June 4, 2003. The parties filed Supplemental Authorities on May 31, 2002 and June 14, 2002. Appellant also filed a Motion for Leave to Present Supplemental Brief Regarding New Authority on Issues Previously Raised and a Supplemental Brief Regarding New Authority on July 3, 2002. That Motion is hereby **GRANTED**. Myers also filed a subsequent Application for Post–Conviction Relief in *Myers I* (PCD 2002–978), therein raising a claim substantially the same as that raised in the Supplemental Brief

¶2 On April 16, 1993, Shawn Williams's body was discovered at Rocky Point on the Port of Catoosa. Forensic examination of her body showed five gunshot wounds; a fatal gunshot wound to her chest ruptured her aorta and caused her death. Williams had other injuries, including abrasions to her chest and abdomen, a laceration on the back of her head, contusion and laceration to her left ear, abrasions to her knees, to her right hip and to her left buttocks. The laceration to the back of her head was consistent with falling and striking her head on the ground; the contusion over her left ear was consistent with being struck by an object. Sperm found in Williams's vagina suggested she was sexually assaulted before she died. DNA testing on the sperm linked Myers to the murder.[3] Myers later confessed to the crime to an inmate in the county jail and also bragged about disposing of Williams's body to another witness prior to his arrest. Other relevant facts will be discussed as necessary.

¶3 Myers raises twenty-one (21) propositions of error.

### JURY SELECTION ISSUES

¶4 In Proposition Eleven, Myers claims the trial court abused its discretion by refusing to remove prospective juror "S" for cause. Myers claims prospective juror "S" would not consider life imprisonment as a punishment option.

¶5 The decision whether to disqualify a prospective juror for cause rests in the trial court's sound discretion whose decision will not be disturbed unless an abuse of discretion is shown. *Humphreys v. State*, 1997 OK CR 59, ¶6, 947 P.2d 565, 570. A venireman who is willing to consider all sentencing options and who is not "irrevocably committed" to one sentence before trial has begun is fit to serve and not vulnerable to removal for cause. *Humphreys*, 1997 OK CR 59, ¶6, 947 P.2d at 571; *Miller v. State*,

1998 OK CR 59, ¶21, 977 P.2d 1099, 1106; *Hain v. State*, 1996 OK CR 26, ¶21, 919 P.2d 1130, 1138.

¶6 When initially questioned by the trial court, juror "S" stated he would have no difficulty considering all three possible penalties for first degree murder. When the prosecutor asked what he thought of life imprisonment as a punishment for murder, juror "S" replied, "[n]ot much," but then stated he thought he could give fair consideration to all three potential punishments. When questioned by defense counsel, juror "S" indicated he believed a life sentence "doesn't mean a total life sentence," and he responded affirmatively to defense counsel's question that in "his opinion" a life sentence was not really an appropriate punishment for murder. He said "it probably would" be difficult for him to consider life imprisonment as a punishment. He admitted it was "true" that he could not realistically give a complete, fair, open and honest consideration to a life sentence.

¶7 The prosecutor rehabilitated prospective juror "S" by asking if he could consider a life sentence under any circumstances, and the juror responded that he thought he "could but I am not in favor of a life sentence." He stated he would listen to the evidence and "would try" to give fair consideration to a life sentence. The trial court then asked juror "S" whether he would be able to consider life imprisonment as a punishment and he said, "yes."

¶8 At this point, defense counsel's motion to remove the prospective juror for cause was denied. Counsel continued to question juror "S" and asked if he just answered that he could not give full consideration to a sentence of life imprisonment to someone who was convicted of first degree murder. The prospective juror responded "yes I did," and admitted that was his opinion. The trial court again denied a challenge for cause.

---

filed July 3, 2002. This Court denied requests of counsel to consolidate this appeal with PCD 2002–978 for purposes of deciding that issue and held the Opinion in this case in abeyance pending resolution of the issue in PCD 2002–978. *See Myers v. State*, 2005 OK CR 22, ¶8, 130 P.3d 262.

3. Chemist Mary Long estimated the probability/match in this case was one in four billion Caucasians on the five genetic loci examined.

¶ 9 When this Court reviews the *voir dire* of potential jurors whose answers are unclear and who appear equivocal in their ability to consider all punishment options, we traditionally defer to the impressions of the trial court who can better assess whether a potential juror would be able to fulfill his or her oath. *Douglas v. State*, 1997 OK CR 79, ¶ 7, 951 P.2d 651, 659. The prospective juror said he would try to give fair consideration to all sentencing options, including a life sentence, and his admitted propensity to favor a sentence greater than life does not show he could not fairly consider the option. *Gilbert v. State*, 1997 OK CR 71, ¶¶ 27–29, 951 P.2d 98, 108–109. While we believe the question here is close, we cannot find the record shows the trial court abused its discretion by denying the motion to remove juror "S" for cause.

## FIRST STAGE ISSUES

¶ 10 Myers argues in Proposition One that the trial court erred when it allowed Sydney Byrd to testify. Byrd was Myers's cellmate while Myers was in the Rogers County Jail. Byrd claimed Myers confessed to him that he had raped and killed a woman.

¶ 11 Prior to trial the State gave notice of its intent to produce Byrd as a witness. Upon defense counsel's request, Judge Post conducted an *in camera* hearing to determine whether Byrd's statements were reliable and admissible. At the conclusion of this hearing, Judge Post concluded Byrd's testimony was admissible. Defense counsel objected to the trial court's finding that Byrd was a credible witness, and on appeal, Myers contends the trial court erred because the record establishes Byrd was unreliable and untrustworthy. Myers submits the prejudicial effect of his testimony outweighed any probative value it might have had.

¶ 12 In *Dodd v. State*, 2000 OK CR 2, 993 P.2d 778, we examined the problems relating to jailhouse informant testimony. Noting that jailhouse informants often expect and receive a benefit in exchange for their testimony and that such exchanges may motivate an informant to lie, we set forth a procedure for trial courts to follow when the State seeks to admit evidence through a jailhouse witness whose testimony is not specifically excluded by the United States Constitution.

At least ten days before trial, the state is required to disclose in discovery: (1) the complete criminal history of the informant; (2) any deal, promise, inducement, or benefit that the offering party has made or may make *in the future* to the informant (emphasis added); (3) the specific statements made by the defendant and the time, place, and manner of their disclosure; (4) all other cases in which the informant testified or offered statements against an individual but was not called, whether the statements were admitted in the case, and whether the informant received any deal, promise, inducement, or benefit in exchange for or subsequent to that testimony or statement; (5) whether at any time the informant recanted that testimony or statement, and if so, a transcript or copy of such recantation; and (6) any other information relevant to the informant's credibility.

*Dodd* at ¶ 25, 993 P.2d at 784.

¶ 13 Here, Myers does not complain the mandatory *Dodd* procedures were not followed, but rather argues the trial court's determination that the jailhouse snitch's testimony was reliable and admissible was erroneous. Myers argues Byrd's testimony at the reliability hearing shows he sought a "favor" from the State for his testimony, lied several times during the hearing, and admitted he had previously worked as a confidential informant in California although denied he received any benefit from that service.

¶ 14 Nothing in *Dodd* requires the trial court to exclude a jailhouse informant's testimony because his or her testimony is inconsistent, unbelievable, or self-serving. The point of *Dodd* was to require more thorough examination of informant evidence and complete and full disclosure of information relating to an informant's motivation to fabricate testimony. In this case, the trial court did not abuse its discretion by allowing the witness to testify. Any conflict or inconsistency in the witness's testimony goes to the weight and credibility of that testimony and are issues properly addressed on cross-examination. *See Gilson v. State*, 2000 OK CR 14,

¶¶ 59–60, 8 P.3d 883, 906–907 (determination of competency of witnesses is left to the discretion of the trial judge; conflict and inconsistencies in testimony go to weight and credibility).

¶ 15 Next Myers claims the State used hearsay testimony to bolster Sydney Byrd's testimony. After Byrd testified, the State, over defense objection, asked Larry Elkin whether the statement Byrd made to him in 1996 was consistent with Byrd's testimony before the jury. Elkin testified it was.

■■■ ¶ 16 Admission of evidence is left to the sound discretion of the trial court and will not be disturbed absent an abuse thereof. *Miller*, 1998 OK CR 59, ¶ 49, 977 P.2d at 1110. Elkin's testimony was admissible under 12 O.S.1991, § 2801(4)(a)(2). Two foundational requirements must be met before a statement is admissible under § 2801(4)(a)(2): First, there must be a suggestion that the witness has either fabricated his trial testimony or has been unduly influenced, and second, it must be established that the consistent statement was made prior to the time when there was a motive for the witness to lie or there was an exercise of improper influence. *DeLozier v. State*, 1998 OK CR 76, ¶ 16, 991 P.2d 22, 27.

¶ 17 Myers concedes the first foundational requirement was met, but argues the second was not. We disagree. Elkins testified he interviewed Byrd in November 1996 while Byrd was in California. At that point, although Byrd had requested to serve out his time in Oklahoma, no one had honored that request. Accordingly, there was no exercise of improper influence or a motive for the witness to lie at that point. *DeLozier*, 1998 OK CR 76, ¶ 20, 991 P.2d at 26. This case is distinguishable from *United States v. Moreno*, 94 F.3d 1453, 1455 (10th Cir.1996) as a codefendant's motivation to lie upon arrest presents a completely different picture. Proposition Two does not warrant relief.

■■■ ¶ 18 In Proposition Three, Myers argues Patricia Curry's identification of him and her testimony concerning a conversation with him violated his right to due process guaranteed by the Fourteenth Amendment of the United States Constitution. Myers objected to Curry's identification prior to trial and a hearing on the reliability and accuracy of her out of court identification was held prior· to trial. At the conclusion of that hearing, the trial court ruled the preliminary threshold of admissibility was met and overruled the objection to her testimony. When defense counsel renewed his objection to Curry's identification at trial, the trial court noted the prior ruling and stated the issue whether she properly identified Myers was a matter for the jury to decide. The issue of Curry's identification was properly preserved for appellate review.

¶ 19 Myers argues on appeal that Curry's identification of him was unreliable and was tainted by an impermissibly suggestive one man show up and a suggestive pretrial photographic lineup. Myers argues one man show-ups are generally condemned because they tend to suggest the person is guilty. Here, Myers compares the news broadcast showing his arrest at Rocky Point to a one man ·show-up. He also argues the photo lineup was unduly suggestive because he was the only man pictured who was wearing an orange, collarless shirt rather than street clothes.

■■■ ¶ 20 Although we do not find the photo lineup was unduly suggestive or prejudicial or the circumstances of the news broadcast were unduly suggestive or that they rise to the level of a one man show-up, the same would not automatically invalidate Curry's subsequent in-court identification if that identification can be established as independently reliable under the totality of the circumstances. *Berry v. State*, 1992 OK CR 41, ¶ 13, 834 P.2d 1002, 1005; *Young v. State*, 2000 OK CR 17, ¶ 31, 12 P.3d 20, 34. This Court utilizes a test which takes into consideration all the surrounding circumstances plus the following:·

1) prior opportunity of the witness to observe the defendant during the alleged criminal act;

2) degree of attention of the witness;

3) accuracy of the witness' prior identification;

4) the witness' level of certainty; and,

5) the time between the crime and the confrontation.

*Young, id.; see also Neil v. Biggers,* 409 U.S. 188, 199, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972); *Stiles v. State,* 1992 OK CR 23, ¶ 41, 829 P.2d 984, 993.

¶ 21 At trial, Patricia Curry, who owned and operated a flower shop in Bristow, Oklahoma in 1996, identified Myers as a man who came into her shop early one Saturday morning in July 1996. He told her he had been out drinking all night and wanted to purchase two roses for his wife. Curry said he knew he was "in trouble." When she suggested he should be careful "because when you slip out the front door someone might be slipping in the back door," he responded, "I will kill the bitch if anything like that would happen." When referring to his wife, he said he would "kill the bitch and she was a whore and a slut and that he knew how to dispose of women."

¶ 22 He went on to tell Curry he needed back in his house; had been drunk all night; had gone to Wellston and picked up a hitchhiker, and that is how he got to Bristow. Myers asked her if she had ever heard of Rocky Point and told her you could dispose of women there. She responded that she had heard of Rocky Point and that it would be hard to dispose of her because she felt threatened. Curry testified she in fact felt threatened by his presence with her alone in the shop. He also asked if she had heard of the woman that was missing and stated that the "investigators had their heads so far up their ass they could never find anybody there and they didn't know what they were doing." Curry testified at that point she felt her life was in jeopardy.

¶ 23 When she finished preparing his roses, Myers gave her a one hundred dollar ($100.00) bill. She did not keep change for a large bill in her cash drawer, and she testified her conscience told her not to turn her back on Myers to walk to the back to obtain change. She handed the bill back to him and told him he could have the flowers and to pass on the kindness. She said Myers told her to go to the back for change, and she again refused. Myers took the flowers and walked out the door. She locked the door when he left and watched him drive away. Curry testified she locked the door because she felt threatened. She then called her husband.

¶ 24 Three weeks later, Curry saw the same man on a television news broadcast about an arrest at "Rocky Point." After the news broadcast, she called the Rogers County Sheriff's Department. Curry later wrote out a statement and picked Myers out of a photographic lineup. When questioned about her identification of him from the photographic lineup, Curry stated she did not pick him out because of what he was wearing; she said the orange shirt was "irrelevant ... I didn't even think of it. I wasn't looking at his clothes, sir, I was looking at him."

¶ 25 Curry said the man stood right in front of her at the flower shop. He was in the shop alone with her for twenty or thirty minutes and she had a good opportunity to look at his face. He wore a snap up western shirt, "somewhat like what he has on today." He wore a welder's cap, gold chain, jeans and boots. His shirt was unbuttoned. Curry said she had no doubt that the man in her shop that day was Myers.

¶ 26 Curry's testimony at trial was certain and showed her degree of attention towards the man in the flower shop was focused. She stood directly in front of Myers for twenty or thirty minutes and during that time was afraid to "turn her back" on him because she was fearful of him. Her testimony concerning her conversation with him in the flower shop was obviously relevant to show why she was so focused on him and why she was subsequently able to identify him. Her identification was sufficiently independently reliable to be admissible. The trial court did not abuse its discretion by allowing into evidence Curry's in-court identification of Myers. *Bryson v. State,* 1985 OK CR 107, ¶¶ 12–15, 711 P.2d 932, 934–935. Proposition Three is denied.

¶ 27 In Proposition Four, Myers argues the trial court erred when it allowed Detective Larry Elkin to testify that Patricia Curry picked him out of a photographic lineup. Myers submits Elkin's testimony con-

cerning Curry's identification amounted to improper bolstering and the error was not harmless under the circumstances of this case. Before Elkins testified concerning the photo-lineup, defense counsel said "I would also object if Mr. Haynes is going to ask Mr. Elkin whether or not this Ms. Curry identified a particular photograph because it's improper bolstering. *No, strike that. I don't object to that.*" (emphasis added) Defense counsel's objection was on "reliability grounds" of the identification in general. Although defense counsel objected immediately following Elkins' testimony concerning which photograph Curry identified, the objection, based upon the preceding testimony, went to the general reliability of the identification, not to improper bolstering. When a specific objection is made a trial, this Court will not entertain a different objection on appeal. *Pickens v. State,* 2001 OK CR 3, ¶ 31, 19 P.3d 866, 878. Our review of this claim is for plain error. *Wilson v. State,* 1998 OK CR 73, ¶ 64, 983 P.2d 448, 464.

¶ 28 Testimony by a third party that an extra-judicial identification was made or that a particular person was identified is error. *Kamees v. State,* 1991 OK CR 91, ¶ 13, 815 P.2d 1204, 1207. However, this improper testimony does not necessitate reversal; when it follows an in-court identification of the accused by the identifier, the error may be found harmless. *Id.,* 815 P.2d at 1208; *see also Allen v. State,* 1989 OK CR 79, ¶ 14, 783 P.2d 494, 498 and cases cited therein.

¶ 29 In this case, Larry Elkins testified immediately after Patricia Curry testified and identified Myers. Elkins testified that Curry picked out Number Four from the photo-lineup. Myers's photograph was Number Four. As discussed in Proposition Three, Curry's identification of Myers was sufficiently reliable to be admissible. Further, we find it was certain, based upon her focused attention and unique circumstances of her contact with Myers, and any error in the admission of Elkins's testimony concerning Curry's identification of Myers from the photo lineup was cumulative and harmless beyond a reasonable doubt. *See Ochoa v. State,* 1998 OK CR 41, ¶ 34, 963 P.2d 583,

597; *Trim v. State,* 1991 OK CR 37, ¶ 8, 808 P.2d 697, 699.

¶ 30 In Proposition Five, Myers argues the trial court violated his right to present evidence in his own defense and his right to due process by restricting defense counsel from asking a witness whether Myers had a speech impediment and from establishing Sydney Byrd could have learned about Myers's crime from a source other than Myers. In both instances, defense counsel objected to the trial court's rulings and the alleged errors are properly preserved for review. Both objections involve defense witness Charles Maybe, an investigator for the Oklahoma Indigent Defense System who worked on Myers's case.

¶ 31 During cross-examination of Patricia Curry, defense counsel asked Curry if the man who came into her flower shop had a speech impediment, and she answered, "no." After the State rested its case, defense counsel asked Maybe, "[i]n your opinion, does Mr. Myers have a speech impediment?" The State objected on grounds of relevancy and competency of the witness to give his opinion. The trial court sustained the objection, presumably on the ground that it would violate Myers's Fifth Amendment rights. As an offer of proof, defense counsel noted Maybe's answer would be "yes."

¶ 32 Despite Myers's arguments to the contrary, the State did not ask any first stage witnesses their opinions of his speech. As Myers has presented the trial court's ruling in regard to Maybe as erroneous and as affecting his ability to impeach Curry's identification of him, what the State asked its witnesses during second stage concerning any speech impediment is irrelevant. Even so, we find nothing improper about the question posed to Maybe and allowing Maybe to answer would not have impinged upon Myers's right to remain silent. The answer Maybe would have given was relevant defense evidence relating to Curry's "description" of the man she later identified as Myers. The trial court erred by sustaining the State's objection and by restricting counsel from asking Maybe about Myers's speech impediment.

¶ 33 Although the trial court erred, no relief is required. A conviction should not be set aside for insubstantial errors. A defendant is entitled to a fair trial, not a perfect one. *See Douglas,* 1997 OK CR 79, ¶ 45, 951 P.2d at 667. In the case of an evidentiary error, the proper inquiry is whether this Court has "grave doubts" that the outcome of the trial would have been materially affected had the error not occurred. *Id.*

¶ 34 Even if the jury heard Maybe's opinion that Myers had a speech impediment, that testimony would only have been relevant in the jury's consideration of the reliability of Curry's identification of Myers as the man in her flower shop. So many other factors supported the reliability of her identification, we doubt a swearing match between Curry and a defense investigator concerning a speech impediment would have had much affect on the jury's consideration of her identification or on the jury's verdict.

¶ 35 Myers also argues the trial court erred when it prevented defense counsel from questioning Maybe about who testified at the preliminary hearing and what might have been covered by the press during that time. The trial court sustained the State's objection to the line of questioning on relevancy grounds. As an offer of proof, defense counsel argued that who testified at the preliminary hearing and what the press covered was relevant because Sydney Byrd was "in the Rogers County area" during the time and could have used the press accounts to fabricate his testimony.

¶ 36 The trial court's decision to limit the defense in this area was not an abuse of discretion. Byrd testified he had not seen any news articles or heard any television reports concerning Myers. That in fact there might have been newspaper articles published or television news reports made during the three weeks prior to November 4, 1996, when Byrd was in the Rogers County area does not establish that in fact Byrd saw those articles and/or reports. Even if Maybe had testified that there were news articles

and/or television reports, such testimony would not establish that Byrd saw them. The trial court ruled the question was not relevant and was "too speculative." We agree, and find no error occurred. 12 O.S. 1991, § 2701.

¶ 37 In Proposition Six, Myers argues the rulings of the trial court that allowed the State to improperly bolster one expert with another and prevented Myers from confronting and fully cross-examining witnesses violated his right of confrontation, right to due process and his right to a fair trial. Myers objected that testimony from the State's expert witness in the area of DNA analysis (Eisenberg) was cumulative, amounted to improper bolstering and was not relevant. The trial court overruled the objection, noting that the defense had attacked the credibility and certification of the State's DNA lab, and that the State was entitled to put on evidence to support the qualifications of the lab.

¶ 38 The jury heard Eisenberg's testimony immediately after OSBI criminalist Mary Long testified that the OSBI DNA unit had completed its validation process, was still involved in the accreditation process with the American Society Crime Lab Directors, and had received blood stains to test in relation to Shawn Marie Williams.[4] Eisenberg worked as a consultant to the OSBI lab for a number of years and worked with Long during that time. Eisenberg stated the methodologies the lab utilized were the standard methodologies used by virtually every laboratory in the country using the RFLP method of analysis. He testified the OSBI lab completed all of its validation work, and he remained as a consultant with the lab until 1997, reviewing ongoing case work, testifying in cases, and conducting ongoing audits of the laboratory. Eisenberg said the American Society Crime Lab Directors was one of only two laboratories involved in the accreditation of DNA forensic laboratories. He stated the accreditation process is extremely lengthy and expensive and "probably less than half of

---

4. To accommodate Dr. Eisenberg's schedule, he was called as a witness during a break in Long's testimony.

all the forensic laboratories are accredited by the ASCLD lab." Eisenberg stated that, in his opinion, nothing would prohibit the DNA portion of the OSBI lab from being accredited. Dr. Eisenberg testified extensively about the processes and methods of DNA analysis. He reviewed a DNA consultant case review—a report of the analysis of DNA evidence received from Appellant and Shawn Marie Williams by the OSBI lab.

■ ¶ 39 The decision whether to allow an expert witness to testify rests within the discretion of the trial court and its decision will not be reversed absent an abuse of discretion. *Barnhart v. State*, 1977 OK CR 18, ¶ 20, 559 P.2d 451, 458. Here, the defense attacked the DNA test results, the accreditation of the lab, and the qualifications of chemist Long to perform the tests. Eisenberg's expert testimony regarding the testing procedures utilized by the lab, his knowledge of the accreditation process, and the qualifications of the lab and Long's qualifications to perform the tests was relevant and helpful to the trier of fact in its understanding of the DNA evidence presented by the State. The trial court did not abuse its discretion by allowing Eisenberg to testify.[5]

■ ¶ 40 Myers also argues the trial court precluded him from effectively cross-examining Eisenberg by sustaining State's objections to many of defense counsel's questions. Title 12 O.S.1991, § 2611(C) provides that cross-examination shall be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. The extent of cross-examination rests in the discretion of the trial court and reversal is only warranted where there is an abuse of discretion resulting in prejudice to the defendant. *Parker v. State*, 1996 OK CR 19, ¶ 13, 917 P.2d 980, 984.

■ ¶ 41 Here, the trial court properly sustained numerous State's objections to questions which called for speculative answers, questions which were previously asked and answered, questions which were

improper impeachment attempts, and questions which were argumentative. In some instances following a State's objection, counsel rephrased. Defense counsel conducted a thorough and extensive cross-examination of Eisenberg. We find no obvious and prejudicial limitation by the trial court of the scope of cross-examination in this case. *Reeves v. State*, 1991 OK CR 101, ¶ 30, 818 P.2d 495, 501.

¶ 42 In Proposition Seven, Myers claims his statutory rights were violated when the State elicited improper opinion testimony from the medical examiner, Dr. Ronald Distefano. Dr. Distefano testified Williams's injuries were consistent with a forcible sexual assault and that she "was the victim of a homicide that a rape was probably also a part of . . ." Defense counsel objected to this testimony as invading the province of the jury and moved for a mistrial. Counsel's objections were overruled and the motion for mistrial denied.

■ ¶ 43 Under 12 O.S.1991, § 2702, expert opinion testimony should be admitted when it will "assist the trier of fact to understand the evidence or to determine a fact in issue. . . ." Section 2403 provides for the exclusion of relevant evidence if its probative value "is substantially outweighed by the danger of unfair prejudice, confusion of the issues, misleading the jury, undue delay, needless presentation of cumulative evidence, or unfair and harmful surprise." Testimony from an expert in the form of an opinion or inference is not objectionable simply because it embraces an ultimate issue to be decided by the jury. 12 O.S.1991, § 2704; *Johnson v. State*, 2004 OK CR 25, ¶ 16, 95 P.3d 1099, 1104. Even though expert testimony may be given on an "ultimate issue," when read together Sections 2701, 2702, and 2403 should work together to bar admission of an opinion which merely tells the jury what result to reach. *Hooks v. State*, 1993 OK CR 41, ¶ 13, 862 P.2d 1273, 1278.

---

5. Myers argues it was improper to allow Eisenberg to vouch for the credibility of Long and the lab when Long "had not even testified." The record shows Eisenberg was called as a witness, out of order, just after Long had begun to testify.

The record does not show the defense objected to Eisenberg testifying out of order; rather, the only objection went to his testimony as being irrelevant or cumulative.

¶ 44 The State's evidence of rape was entirely circumstantial. Williams was missing for several days before her body was found. Her shorts were on backwards and her body bore signs of a struggle and signs of being dragged. Although gunshot wounds caused her death, the above circumstances, combined with seminal fluid found in her vagina, led the medical examiner to conclude she was likely involved in a sexual assault or raped prior to her death. To determine the cause and manner of death, Dr. Distefano testified he not only considers the results of autopsy and physical examination, but also considers information and other evidence obtained by his investigators. Dr. Distefano testified he believed his findings upon examination were consistent with a sexual assault/rape based "on really all of the circumstances" that he knew about the case.

 ¶ 45 Dr. Distefano's testimony did not tell the jury what conclusion to reach. His testimony came with the caveat that it was his opinion based upon the circumstances. It was relevant to assist the jury in reaching a conclusion. 12 O.S.1991, §§ 2701, 2702. Further, defense counsel thoroughly cross-examined Dr. Distefano on his opinion that she was "probably raped." Through cross-examination, counsel established there was no physical evidence of forcible sexual intercourse, no vaginal injuries; the only physical evidence of intercourse was that sperm was deposited in her vagina within twenty-four hours of her death. Although Dr. Distefano opined that Williams was raped, the jury clearly could reach its own conclusion on this issue. The trial court did not err by allowing the medical examiner to testify to his opinion that Shawn Williams was raped and no error occurred which warrants relief.

## OTHER CRIMES EVIDENCE

 Evidence of other crimes, wrongs or bad acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.

12 O.S.1991, § 2404(B); *Burks v. State,* 1979 OK CR 10, ¶ 2, 594 P.2d 771, 772, *overruled in part on other grounds in Jones v. State,* 1989 OK CR 7, ¶ 8, 772 P.2d 922, 925. These exceptions to the admission of other crimes evidence are not exclusive. *Myers I,* 2000 OK CR 25, ¶ 24, 17 P.3d at 1030. However, even other crimes evidence which is admissible under a specified exception must display probative value sufficient to outweigh any prejudicial effect. *Burks,* 1979 OK CR 10, ¶ 8, 594 P.2d at 773.

¶ 46 The State initially charged Myers with two counts of first degree Murder; the counts were severed, and the State proceeded against him first for the murder of Cindy Marzano. Prior to severance, the State provided Myers with notice that it intended to offer evidence of other crimes at trial. These notices showed the State's intent to not only introduce evidence of Myers's murder of Marzano, but also of his conversation with Patricia Curry, his prior assaults against Bonnie Makin Hames and Stacey Lane Fain, and the murder of Chink Elders for which he was never prosecuted. Prior to Myers's trial, the trial court heard arguments on his Motion in Limine, and sustained the motion in part, specifically as it related to mention of the Marzano murder, and Myers's prior assaults of Hames and Fain. In Proposition Eight, Myers claims the trial court erred by allowing the State to introduce evidence of other crimes and by refusing to grant a mistrial when references to other crimes were made in violation of the court's ruling in the first stage of trial.

¶ 47 The trial court cautioned Sydney Byrd prior to his testimony that he should not make any statements indicating Myers killed more than one woman. However, during redirect examination, the prosecutor asked Byrd whether anyone else in the jail cell might have overheard Myers talking to him because of the level of their voices. Byrd responded, "Oh well, absolutely. He was telling me about raping and murdering these women, yeah. You get excited." Defense counsel objected and moved for a mistrial; the motion for mistrial was denied. The parties agreed the trial court would instruct the jury to "disregard the last question and

answer of counsel and not consider it in your deliberations or in any other aspect."

¶ 48 Before the next witness (Patricia Curry) testified, defense counsel asked the trial court to prohibit her from testifying that Myers told her "you can get rid of women there." The trial court refused, stating it would be improper for her to "rewrite the words she is quoting as having been uttered by the defendant ..." Thereafter, Curry testified Myers told her "he knew how to dispose of women," and when talking about Rocky Point said "you could dispose of women there."

¶ 49 Myers argues there was no reason for the trial court to allow Curry to reference plural "women" when previously finding Byrd should not. However, we see a clear difference—a difference noted by the trial court. Byrd's objectionable testimony was an outburst and the words he spoke were his own. Curry was quoting Myers and she specifically testified about what he said to her. We find no error in the manner which the trial court handled the objections to these two witnesses' references to plural victims. See Al–Mosawi v. State, 1996 OK CR 59, ¶ 59, 929 P.2d 270, 284 (a trial court's admonition to jury to disregard the remarks of counsel or of a witness usually cures any error unless it is of such a nature, after considering the evidence, that the error appears to have determined the verdict). Further, Myers has not shown Byrd's statement was verdict determinative.

¶ 50 Myers also argues Curry's testimony was in violation of the trial court's ruling limiting her testimony. The trial court ruled it would admonish Curry not to "address specifically the disposition of women's bodies and how easy it was to dispose of them in sandy soil in Texas or east Texas." The trial court indicated it wanted to preclude her discussion of the disposal of "bodies in east Texas," but the trial court also acknowledged "the central relevance of her testimony has to do with the body of a woman at Rocky Point and the Rocky Point name .... and I think the State is entitled to get that in." We find Curry's testimony that Myers said he "knew how to dispose of women" did not violate the trial court's ruling in limine. Curry's testimony about what Myers said directly related to the crime in question and was an admission by Myers directly relating to the crime in question. See Myers I, 2000 OK CR 25, ¶ 27, 17 P.3d at 1030.

¶ 51 Myers also argues Curry's testimony that she felt threatened by Myers, felt her life was in jeopardy, and that she locked the door after he left was inadmissible evidence of other crimes. This testimony was relevant to show the witness's state of mind and it helped explain to the jury why Curry was able to identify Myers several weeks later. This testimony was properly admitted and was not evidence of other crimes. 12 O.S.1991, § 2402.

¶ 52 Next, Myers complains chemist Mary Long injected other crimes evidence when she responded to a prosecutor's question and mentioned the name Mark Marzano. The prosecutor asked her how two envelopes were labeled. She responded, "These two envelopes are labeled T98 Karl Myers. And the second one is labeled T108 Mark Marzano." Defense counsel objected and moved for a mistrial. The trial court sustained the objection, cautioned Long not to mention the name Marzano, and denied the motion for mistrial. The trial court and the parties agreed an admonishment would draw further attention to the matter and no admonishment was given. Myers submits Long's mention of the name Marzano could have triggered certain jurors to remember details they might have read or heard concerning the Marzano trial.

¶ 53 We are not persuaded that the mere mention of the name Marzano was the equivalent of the admission of other crimes evidence. Myers's argument is purely speculative and we find the trial court's decision to caution the witness to avoid reference to the name a completely appropriate curative action and no further relief is required.

¶ 54 Lastly, Myers complains the prosecutor improperly referenced other crimes during opening statements and during closing argument. During opening statements, one prosecutor said, "we anticipate a witness will come in and testify that the defendant has made comments to her about disposal of

bodies at this Rocky Point area." During closing argument, the prosecutor referred to Curry's testimony that Myers said "you could get rid of women there" and argued the "veil of innocence" had been lifted. No objection was made to the prosecutors' statements and our review is for plain érror. *Simpson v. State*, 1994 OK CR 40, 876 P.2d 690, 695.

¶ 55 We find no plain error. Opening statements are intended to show the jury what evidence the parties intend to present and what the parties expect the evidence to prove, and to prepare jurors' minds for the evidence that will be presented. *Malicoat v. State*, 2000 OK CR 1, ¶ 10, 992 P.2d 383, 394–395. The prosecutor's reference in opening statement about what he anticipated a witness would testify to was proper comment. We address the veil of innocence argument more fully below.

## PROSECUTORIAL MISCONDUCT

¶ 56 In Proposition Nine, Myers claims prosecutorial misconduct deprived him of a fair trial. During *voir dire*, the trial court overruled defense counsel's objections to the prosecutor's questions to prospective jurors to look at the jury instructions to see if the instruction on the State's burden of proof used the language "beyond all doubt," "a shadow of a doubt," "all doubt," or "any doubt." Myers argues this Court has repeatedly criticized prosecutors' attempts to define reasonable doubt and submits the trial court committed reversible error by failing to sustain the objections.

¶ 57 Here, the prosecutor's use of the phrases "beyond all doubt," "a shadow of a doubt," "all doubt," or "any doubt" when emphasizing the jury should closely examine and consider the language of the jury instructions was not the equivalent of improperly defining reasonable doubt. It is not error for a prosecutor to tell jurors to focus on the language of the jury instructions. In this case, the prosecutor wanted the jury to consider what language the instructions did *not* contain in an attempt to dispel commonly held attitudes concerning the definition of reasonable doubt. *Hammon v. State*, 1995 OK CR 33, ¶ 83, 898 P.2d 1287, 1305.

¶ 58 Myers claims error occurred when the prosecutor argued "that veil of innocence has been removed from Karl Myers, that he sits there now as a guilty man ..." Counsel did not object and we review this claim for plain error. *Simpson*, 1994 OK CR 40, 876 P.2d at 695.

¶ 59 It is error for a prosecutor to argue that the "cloak" of innocence has been stripped from a defendant. *See Miller v. State*, 1992 OK CR 77, ¶¶ 4–5, 843 P.2d 389, 390; *Hamilton v. State*, 1997 OK CR 14, ¶ 34, 937 P.2d 1001, 1010. We see no significant difference in the words cloak and "veil" as used in this case. However here, as in *Hamilton*, in light of the overwhelming evidence of guilt in this case, any error in the prosecutor's argument was harmless beyond a reasonable doubt. *Hamilton, id.; Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

¶ 60 Last, Myers complains that the prosecutor improperly commented upon his failure to independently test the DNA evidence and such comments unconstitutionally shifted the burden of proof by misleading the jury into believing Myers was required to come forward with evidence. Defense counsel objected only once and the objection was sustained. The jury was not admonished. No objection was made to the prosecutor's closing argument on this subject.

¶ 61 It is not improper for a prosecutor to comment on State's evidence which is uncontroverted. *Robinson v. State*, 1995 OK CR 25, ¶¶ 21–22, 900 P.2d 389, 398. At trial, Myers contested the State's handling and reliability of the DNA evidence throughout the trial. It was fair comment for the State to indicate and show Myers had access to the same samples and did not have them tested to contradict the reliability of the State's DNA testing results. *Cf. Pickens v. State*, 2001 OK CR 3, ¶ 39, 19 P.3d 866, 880 (comments on the defendant's access to evidence and witnesses is permissible).

¶ 62 Allegations of prosecutorial misconduct do not warrant reversal of a conviction unless the cumulative effect of the con-

duct deprived the defendant of a fair trial. *Washington v. State*, 1999 OK CR 22, ¶ 41, 989 P.2d 960, 974. Having reviewed each of the instances of alleged misconduct, we find only one amounts to misconduct and it does not warrant relief. Accordingly, this proposition of error is denied.

## JURY INSTRUCTIONS

¶ 63 Myers claims in Proposition Ten that at the conclusion of the first stage of trial, the trial court erred when it administered Jury Instruction No. 2 (OUJI–CR 2d. 10–2) which states:

It is your responsibility as jurors to determine the facts from the evidence, to follow the rules of law as stated in these instructions, to reach a fair and impartial verdict of guilty or not guilty based upon the evidence, and to determine punishment if you should find the defendant guilty as you have sworn you would do. You must not use any method of chance in arriving at a verdict, but must base your verdict on the judgment of each juror.

Myers submits the language "to determine punishment if you should find the defendant guilty as you have sworn you would do" is misleading because in a bifurcated or death penalty trial, the issue of punishment is not before the jury at the conclusion of the first stage. Although Myers admits the jury was properly instructed in Jury Instruction No. 11 that the issue of punishment was "not before you at this time," he submits Jury Instruction No. 2 suggests the jury is sworn to find the defendant guilty. Relying upon *Boyde v. California*, 494 U.S. 370, 380, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990), Myers argues the error constitutes a denial of due process and is reversible where there is a "reasonable likelihood" that the jury has applied the challenged instruction in an unconstitutional manner.

¶ 64 Defense counsel did not object to this uniform instruction at trial and our review is for plain error. *Roberts v. State*, 2001 OK CR 14, ¶ 7, 29 P.3d 583, 585. When there is no objection to an instruction at the trial court level and an appellant challenges an instruction as ambiguous, we look at whether the instructions, taken as a whole,

properly advise the jury of the applicable law. *See Thomas v. State*, 1991 OK CR 58, ¶ 37, 811 P.2d 1337, 1346.

¶ 65 Here, the jury was properly instructed in Jury Instruction No. 11 that the issue of punishment was not before them at this time. In addition, the first stage instructions, as a whole, did not address the issue of punishment. Further, even utilizing the "reasonable likelihood" standard set forth in *Boyde*, we find the jury was properly instructed on the elements of the crime and the State's burden of proof in the first stage of trial, and the instructions taken as a whole were not confusing or ambiguous.

¶ 66 However, even though we find no plain error, we are convinced by Myers's argument that the uniform jury instruction, OUJI–CR 2d. 10–2, requires some modification. Accordingly, we prospectively modify OUJI–CR 2d. 10–2 to read:

It is your responsibility as jurors to determine the facts from the evidence, to follow the rules of law as stated in these instructions, to reach a fair and impartial verdict of guilty or not guilty based upon the evidence, *[and to determine punishment if you should find the defendant guilty,]* as you have sworn you would do. You must not use any method of chance in arriving at a verdict, but must base your verdict on the judgment of each juror.

The Notes on Use following OUJI–CR 2d. 10–1 shall also be amended to indicate the bracketed material in the modified OUJI–CR 2d. 10–2 instruction shall only be used in non-bifurcated trials.

## INEFFECTIVE ASSISTANCE OF COUNSEL

¶ 67 In his twentieth proposition of error, Myers claims his trial counsel's performance was constitutionally ineffective, because trial counsel "failed to investigate and present evidence so important" that the guilt and sentencing verdicts are unreliable. Simultaneously with the filing of his Brief in Chief, counsel for Myers filed an Application for Evidentiary Hearing on Sixth Amendment Claims, pursuant to Rule 3.11(B)(3), *Rules of the Oklahoma Court of Criminal*

*Appeals,* Title 22, Ch.18, App. (2001). Myers argues his claim of ineffective assistance of trial counsel is supported by matters outside the appeal record and urges this Court to remand for an evidentiary hearing to develop facts relating to his claim. Attached to the Application for Evidentiary Hearing are Affidavits offered to meet the burden set forth in Rule 3.11(B)(3)(b) that "the application and affidavits must contain sufficient information to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective." Rule 3.11.

¶ 68 Myers argues his counsel's trial investigation was inadequate in two areas: impeachment evidence relating to Sydney Byrd and mitigation evidence. In support of his Application for Evidentiary Hearing, counsel for Myers has filed her own Affidavit and Affidavits of Kristin Brown, Barry Rouw, and John Struchtemeyer. (Exhibits 1–4, respectively).

¶ 69 The Affidavits of Kristin Brown, and Barry Rouw suggest that Byrd was or could have been suffering from some psychiatric disorder and was or could have been medicated at the time he claims Myers confessed to him. Further, appellate counsel argues his Byrd's prior criminal records would have revealed his propensity to distort reality or lie. Appellate counsel argues the Affidavits show a probability that trial counsel was ineffective for not obtaining and presenting evidence that would have severely undermined Byrd's credibility.

¶ 70 Appellate counsel also argues trial counsel's performance fell below objective standards because he did not obtain Myers's school records and use them as mitigation evidence. Counsel argues the school records would have confirmed Myers's sister's testimony about Myers's very bad childhood and would have also corroborated Dr. Murphy's testimony that Myers suffered from mental deficits. Counsel argues "[I]n sum, Mr. Myers' school records would have dispelled any doubts about the accuracy of the pictures painted by Ms. Robitaille and Dr. Murphy."

¶ 71 Analysis of a claim of ineffective assistance of counsel begins with the presumption that trial counsel was competent to provide the guiding hand the accused needed, and therefore the burden is on the accused to demonstrate both deficient performance and resulting prejudice. *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). *Strickland* sets forth a two-part test to be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. Unless the defendant makes both showings, "it cannot be said that the conviction .... resulted from a breakdown in the adversary process that renders the result unreliable." *Id.* at 687, 104 S.Ct. at 2064. Appellant must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. *Id.* at 689, 104 S.Ct. at 2065–66.

¶ 72 Here, the record shows trial counsel thoroughly and successfully attacked Byrd's credibility and exposed his motive to fabricate to the jury. Further, the evidence contained in the elementary school records which trial counsel did not discover or utilize was arguably cumulative to the testimony of Dr. Murphy and Appellant's sister.

¶ 73 Review of the Application and the supporting Affidavits show trial counsel certainly could have obtained and utilized this evidence for trial. However, it does not show by "clear and convincing evidence" a strong possibility that trial counsel was ineffective for failing to identify or utilize this evidence. Accordingly, we decline to grant the Application for Evidentiary Hearing and relief is denied on Proposition Twenty.

## SECOND STAGE ISSUES

¶ 74 Myers argues, in Proposition Fourteen, that the State's evidence was insufficient to prove beyond a reasonable doubt that the murder was especially heinous, atrocious, or cruel, and we agree. This Court has limited the heinous, atrocious, or cruel aggravating circumstances to those cases where the State proves beyond a reasonable doubt that the murder of the victim was

preceded by torture or serious physical abuse, which may include the infliction of either great physical anguish or extreme mental cruelty. *Cheney v. State,* 1995 OK CR 72, ¶ 15, 909 P.2d 74, 80.

¶ 75 When the sufficiency of the evidence of an aggravating circumstance is challenged on appeal, the proper test is whether there was any competent evidence to support the State's charge that the aggravating circumstance existed. *Martinez v. State,* 1999 OK CR 33, ¶ 69, 984 P.2d 813, 830. In making this determination, this Court should review the evidence in a light most favorable to the State. *Id.*

¶ 76 Williams's car was found abandoned eleven (11) miles from Rocky Point. Investigators discovered a large blood stain in the parking lot of Rocky Point and drag marks from that stain to where her body was found. Williams was shot five times. The medical examiner could not be certain which of the gunshot wounds caused Williams to lose consciousness, but the gunshot wound to her head could have rendered her immediately unconscious. The evidence where Williams's body was discovered suggests she was shot at Rocky Point and, if she were taken there unwillingly, one might guess that she feared she would not see her children again.

¶ 77 We cannot find this circumstantial evidence supports the jury's conclusion, beyond a reasonable doubt, that Williams's murder was preceded either by torture or serious physical abuse. The evidence does not prove Williams was conscious and aware of her attack or that she was conscious and alive suffering pain after the attack. *See Black,* 2001 OK CR 5, ¶ 79, 21 P.3d at 1074. It also does not prove she suffered extreme mental anguish in addition to that which of necessity accompanied the homicide. *Cheney,* 1995 OK CR 72, ¶ 15, 909 P.2d at 80. The evidence does not show, beyond a reasonable doubt and in a light most favorable to the State, that Williams's death was preceded by torture or serious physical abuse.

¶ 78 Because we find insufficient evidence to sustain the jury's finding of the heinous, atrocious and cruel aggravating circumstance, we need not address the claim raised in Proposition Thirteen.

¶ 79 In Proposition Fifteen, Myers contends the trial court's refusal to give the requested instruction on mitigation improperly conveyed the judge's personal opinion and deprived him of a fair penalty determination. During the second stage of trial, Layne Davison, Myers's case manager at the Oklahoma State Penitentiary (OSP), testified concerning his behavior while in prison. He evaluated Myers's behavior as good; he had no trouble with other inmates and had no disciplinary problems. Defense counsel requested the following instruction relating to the "continuing threat" aggravator: "Karl Lee Myers functions well in the secure environment of prison, has not misbehaved, gives no trouble to other inmates or staff, and would not be a continuing threat to others in a prison setting." The State objected to the last clause of the requested instruction, beginning with the word "staff" [6] on the ground that the objectionable language "would invade the province of the jury to make a conclusion whether or not that evidence presented would amount to—that he is not a continuing threat to society." Defense counsel did not object to omitting the language.

¶ 80 On appeal, Myers argues that the words "or staff" should not have been omitted, that the omission prevented the jury from considering the important mitigating evidence that Myers was not a threat to prison staff, and that the trial court's omission of this language might have been intentional. Review of the record does not support the claims. The record shows defense counsel did not object to deleting the language of the requested instruction beginning with "staff" and our review is for plain error.

¶ 81 On cross-examination, Mr. Davison admitted that Myers did not have any physical contact with prison staff unless he is restrained. Accordingly, it was not plain

---

6. Although Myers claims the State objected to the "last clause" of the requested instruction, review of the trial transcript shows the State did not "object to anything *preceding the word staff.*" (emphasis added).

error to omit the language relating to his behavior towards prison staff. The trial judge modified the instruction to the extent that it was not supported by the evidence. In addition, the jury was also instructed that it "may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well." Myers was not prevented from presenting mitigating evidence to the jury and the jury was instructed it could decide other mitigating circumstances existed. *See Ochoa v. State,* 1998 OK CR 41, ¶ 71, 963 P.2d 583, 605. No plain error occurred.

 ¶ 82 In Proposition Twelve, Myers claims his constitutional rights were violated when the testimony of State's witness Charles Sharp was admitted. Sharp, a former sheriff from Cherokee County, Kansas, testified that Myers confessed he killed Chink Elders in Kansas in 1978. Sharp testified Myers was never prosecuted for the murder because Sharp granted Myers complete immunity from prosecution before he confessed.

¶ 83 This Court addressed this issue in *Myers I.*[7] Myers was prosecuted in that case for the murder of Cindy Marzano. Sharp's testimony in this case was virtually identical to that given in the Marzano case.

¶ 84 In *Myers I,* we said, "A confession made under the promise of immunity cannot be considered a voluntary confession." 2000 OK CR 25, ¶ 55, 17 P.3d at 1034.

> To be admissible, a confession must be "free and voluntary: that is, must not be extracted by any sort of threats or violence, nor obtained by any direct or implied promises, however slight, nor by the exertion of any improper influence." *Brady v. United States,* 397 U.S. 742, 754, 90 S.Ct. 1463, 1471–72, 25 L.Ed.2d 747 (1970), *quoting Bram v. United States,* 168 U.S. 532, 542–43, 18 S.Ct. 183, 187, 42 L.Ed. 568 (1897); *see also, Malloy v. Hogan,* 378 U.S. 1, 7, 84 S.Ct. 1489, 1493, 12 L.Ed.2d 653 (1964). This Court has stated that "[A] confession made or induced by promise of reward or benefit ... would be deemed involuntary, and would not be ad-

missible." *Ex parte Ellis,* 1963 OK CR 62, ¶ 18, 383 P.2d 706, 709.

*Id.* There, we determined the promise of immunity was clearly used to obtain the confession. The confession would have been inadmissible against Myers in a criminal trial for the murder of Chink Elders; and, similarly the confession would not be admissible in the second stage of a capital murder trial as evidence of an aggravating circumstance. *Id.* We found this error to be constitutional, but harmless beyond a reasonable doubt. *Id.,* 2000 OK CR 25, ¶ 59, 17 P.3d 1021.

¶ 85 In this case, Appellant admits the above ruling applies "with equal force in the present case." He submits the issue to be determined here is whether the constitutional violation is harmless in the context of this case.

¶ 86 As in *Myers I,* this confession was utilized by the State to prove the continuing threat aggravating circumstance. Besides this evidence, the State presented evidence that Myers had been convicted of a prior assault with intent to rape, had been previously convicted of murdering Cindy Marzano, and had been in possession of a firearm after a felony conviction. Even without this confession, there was sufficient evidence to support the continuing threat aggravating circumstance. In light of the overwhelming evidence in support of this aggravating circumstance, we find the introduction of the confession was harmless beyond a reasonable doubt, because when viewed in light of all the evidence presented in aggravation, there is no reasonable probability the error contributed to the imposition of the death penalty. *See Bryson v. State,* 1994 OK CR 32, ¶ 41, 876 P.2d 240, 256–57.

 ¶ 87 In Proposition Seventeen, Appellant argues his death sentence must be vacated because three of the aggravating circumstances found by the jury are unconstitutionally vague and overly broad as construed by this Court, in violation of the Eighth and Fourteenth Amendments of the United States Constitution and Article II, Sections Seven and Nine of the Oklahoma Constitution. First, Appellant argues

7. *See n. 1.*

the continuing threat aggravator is unconstitutionally vague and overbroad. We have repeatedly rejected this claim and Myers advances no new reason why it should be reconsidered. Appellant complains that the jury instruction defining continuing threat, OUJI–CR 2d. 4–74, lowers the State's burden of proof and does not properly define the degree of probability required for the aggravator. In *Williams v. State,* 2001 OK CR 9, ¶ 78, 22 P.3d 702, 722, we found OUJI–CR 2d. 4–74 was not ambiguous or subject to erroneous interpretation and there noted previous cases where we found the instruction was a correct statement of law that properly channeled the discretion of the jury. *Id.* We also have previously held this aggravator as defined by OUJI–CR 2d. 2–74 is not unconstitutionally overbroad for using the term "probability." *Bland v. State,* 2000 OK CR 11, ¶ 87, 4 P.3d 702, 725.

¶ 88 Myers argues the "especially heinous, atrocious, or cruel" aggravator is unconstitutionally vague and overbroad as applied and on its face. We have already determined this aggravator cannot stand in this case and its constitutionality need not be addressed.[8]

¶ 89 Myers also argues the "murder to avoid arrest or prosecution" aggravator is unconstitutionally overbroad, "taking in a huge portion of persons convicted of first degree murder." We have previously held the application of this aggravator is sufficiently limited by the requirements that (a) a predicate crime existed, apart from the murder, from which the defendant sought to avoid arrest/prosecution, and (b) the State presented evidence that established the defendant's intent to kill to avoid arrest or prosecution. *Alverson v. State,* 1999 OK CR 21, ¶ 75, 983 P.2d 498, 520; *see also Pickens,* 2001 OK CR 3, ¶ 53, 19 P.3d at 883. Proposition Seventeen does not require relief.

¶ 90 During the second stage of trial, the medical examiner testified about the injuries that accompanied and caused Cindy Marzano's death. Larry Elkin testified about his investigation of the Marzano murder. Mark Marzano testified about his wife's disappear-

ance. The State also introduced autopsy diagrams and three photographs of Marzano. Defense counsel objected to the testimony and to the admission of the documentary exhibits as well. After the presentation of this evidence, the parties stipulated that Myers had been convicted of Marzano's murder. In Proposition Eighteen, Myers claims the prejudicial impact of evidence regarding his murder of Cindy Marzano outweighed any probative value it had and argues the evidence should have been excluded.

¶ 91 To support continuing threat as an aggravating circumstance, "the State must present evidence showing the defendant's behavior demonstrated a threat to society and a probability that threat would continue to exist in the future." *Wackerly v. State,* 2000 OK CR 15, ¶ 52, 12 P.3d 1, 16. To prove this aggravator, "the State [must] present sufficient evidence concerning prior convictions or unadjudicated crimes to show a pattern of criminal conduct that will likely continue in the future ..." *Malone v. State,* 1994 OK CR 43, ¶ 38, 876 P.2d 707, 717.

¶ 92 Myers complains that the testimony relating to the Marzano murder was more prejudicial than probative and had the effect of retrying him for his past crime against Cindy Marzano, but we disagree. Even when a defendant stipulates that he has a prior conviction, the "details of the prior conviction" may still be presented to support the continuing threat aggravating circumstance. *Bland,* 2000 OK CR 11, ¶ 76, 4 P.3d 702, 723. In *Bland,* we found the admission of testimony relating to the circumstances of a twenty year old homicide was more probative than prejudicial, did not constitute a retrial of the crime, and that to have excluded the evidence would have deprived the sentencer of highly relevant information concerning the defendant. *Id.* at ¶ 77, 4 P.3d at 723.

¶ 93 Here, neither the admission of autopsy diagrams and photographs of Marzano nor Mark Marzano's testimony was more preju-

---

8. We have repeatedly upheld the constitutionality of this aggravator. *See Black v. State,* 2001 OK CR 5, ¶ 77, 21 P.3d 1047, 1073 and cases cited therein.

dicial than probative.[9] The circumstances surrounding Marzano's disappearance and details of her injuries were relevant and admissible to show Myers constituted a continuing threat. *Id.*

¶ 94 Myers claims the introduction of evidence relating to "unadjudicated acts" in the penalty stage of trial violated his Fifth, Sixth, Eighth and Fourteenth Amendment rights to the federal constitution and his rights under Article II, §§ 7, 9 and 20 of the Oklahoma Constitution. To support the continuing threat aggravator, the State introduced evidence through a former step-daughter, Stacy Fain, that Myers had molested her and threatened to kill her if she told anyone. Although the molestation was reported to authorities, Myers was never prosecuted for the offense. The State also introduced testimony of Myers's confession to the murder of Chink Elders, which this Court has addressed in an unrelated proposition.

¶ 95 Evidence of prior unadjudicated acts of violent conduct are relevant and admissible in the penalty phase of a capital trial to prove the continuing threat aggravator. *See e.g., Turrentine v. State,* 1998 OK CR 33, ¶ 77, 965 P.2d 955, 977; *Johnson v. State,* 1996 OK CR 36, ¶ 36, 928 P.2d 309, 318. Myers urges this Court to depart from this well-established precedent for the reasons stated by Judge Chapel in his dissent in *Paxton v. State,* 1993 OK CR 59, ¶¶ 2–9, 867 P.2d 1309, 1334–1336 (Chapel, dissenting), and because admission of this evidence violates notions of due process and the prohibition against cruel and unusual punishment. We decline to revisit this issue and find the admission of testimony relating to his assault on Stacey Fain and his murder of Chink Elders did not deprive him of a fair sentencing proceeding or due process. Proposition Nineteen does not warrant relief.

¶ 96 In Proposition Sixteen, Myers argues his death sentence should be vacated because the execution of the mentally retarded and the neurologically damaged constitutes cruel and unusual punishment.

Executions of mentally retarded criminals constitute "cruel and unusual punishments" and are prohibited by the Eighth Amendment. *Atkins v. Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). The Court in *Atkins* left it to the individual States to define mental retardation and to develop appropriate procedures to enforce this constitutional restriction. *Atkins,* 536 U.S. at 317, 122 S.Ct. at 2250.

¶ 97 Following *Atkins,* in *Murphy v. State,* 2002 OK CR 32, ¶ 31, 54 P.3d 556, 567–568, *modified in State, ex. rel Lane v. Bass,* 2004 OK CR 14, 87 P.3d 629, 631–632, we set forth a definition of mental retardation to be used in capital trials where an individual claims he or she is not death penalty eligible due to mental retardation. For capital purposes, a mentally retarded person is one with significantly limited ability to intellectually and adaptively function in certain enumerated areas, who has at least one IQ test score of seventy (70) or below, and in whom the retardation manifested itself before the age of eighteen (18). *Id.*

¶ 98 At trial, Dr. Philip Murphy testified Myers's full scale I.Q. score was seventy-seven (77); his verbal score was seventy (70), which is in the mild mental retardation range and his performance I.Q. score was eighty-six (86) which falls within the dull average range. Dr. Murphy concluded Myers fell in a borderline range of between normal functioning and mentally retarded functioning. Myers also is dyslexic, suffers from aphasia, and exhibits indicators of organic brain damage.

¶ 99 On appeal, appellate counsel filed a Notice of Extra–Record Evidence Supporting Appellant's Proposition of Error Regarding Execution of the Mentally Retarded. Attached thereto are exhibits containing school records that show Myers's mental and emotional status dating back to September of 1954. These records were not admitted in the trial of this matter, and Myers requests this Court allow the materials to be supplemented to the appeal record under Rule

---

9. We note Mark Marzano did not "detail" the effects Cindy Marzano's murder had on their children. In fact, review of his testimony shows he only testified they had four children and gave their ages.

3.11(A), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2001).

¶ 100 Before filing this appeal, Myers appealed his conviction and death sentence imposed for the murder of Cindy Marzano, and we affirmed his conviction and sentence of death. *Myers I,* 17 P.3d 1021, 2000 OK CR 25. We denied his Original Application for Post–Conviction Relief relating to that conviction. *Myers v. State,* PCD 2000–516 (Okl. Cr. February 6, 2001) (not for publication).

¶ 101 While this appeal was pending and after the Supreme Court decided *Atkins,* Myers filed a subsequent application for post-conviction relief relating to the Marzano case and *Myers I.* In this subsequent application, Myers raised an *Atkins* claim and argued he could not be executed due to mental retardation. We denied the subsequent application in part, but remanded the matter to the District Court of Rogers County for an evidentiary hearing on Myers's claim of mental retardation. *See Myers v. State,* PCD 2002–978, (Okl.Cr. August 1, 2003) (not for publication). Following an evidentiary hearing, a jury trial was held on Myers's claim of mental retardation. The jury returned with a verdict that Myers was not mentally retarded. This Court denied post-conviction relief after the mental retardation jury trial and found the record supported the jury's verdict that Myers is not mentally retarded. *Myers v. State,* 2005 OK CR 22, ¶ 8, 130 P.3d 262.

¶ 102 This Court previously denied requests of counsel to consolidate this appeal with PCD 2002–978 on November 5, 2003 and June 23, 2004. *See Myers v. State,* PCD 2002–978 and PCD 2002–258 (Okl.Cr. November 5, 2003)(not for publication) and *Myers v. State,* PCD 2002–978 (Okl.Cr. June 23, 2004) (not for publication). An additional remand for an evidentiary hearing and/or jury determination on Myers's claim of mental retardation in this appeal is not warranted because a jury has already determined Myers is not mentally retarded, and this Court has affirmed that verdict on appeal. *Smith v. State,* 2002 OK CR 2, ¶ 7, 46 P.3d 136, 137 (when an issue of ultimate fact has been determined by a valid and final judg-

ment, that issue cannot be relitigated between the same parties in any future lawsuit). Accordingly, no relief is warranted on Proposition Sixteen as the issue has previously been decided and the Motion to file Notice of Extra–Record Evidence Supporting Appellant's Proposition of Error Regarding Execution of the Mentally Retarded is therefore ***DENIED.*** A jury has determined Myers is not mentally retarded, and we affirmed that finding on appeal. *Myers,* 2005 OK CR 22, ¶ 11, 130 P.3d 262.

## ACCUMULATION OF ERROR

¶ 103 In his final proposition of error, Myers asks this Court to review the aggregate impact of the errors in his case in addition to reviewing them individually. Where there is no error, there can be no accumulation of error; however, "when there have been numerous irregularities during the course of the trial that tend to prejudice the rights of the defendant, reversal will be required if the cumulative effect of all the errors was to deny the defendant a fair trial." *Smith v. State,* 1996 OK CR 50, ¶ 62, 932 P.2d 521, 538. While in this case we have found a few irregularities during the course of the trial, even taken together, these irregularities are not so great as to have denied Myers a fundamentally fair trial. After reviewing the errors in the aggregate, we find they were harmless beyond a reasonable doubt and no relief is warranted.

## MANDATORY SENTENCE REVIEW

¶ 104 In accordance with our statutory duty, we must now determine whether the death sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor, and also whether the evidence supports the jury's finding of the alleged statutory aggravating circumstances. *See* 21 O.S.1991, § 701.13(C). The jury found the existence of four (4) aggravating circumstances: (1) the murder was especially heinous, atrocious, or cruel; (2) the Defendant was previously convicted of a felony involving the use or threat of violence; (3) the existence of a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to soci-

ety; and, (4) the murder was committed for the purpose of avoiding arrest or preventing a lawful arrest or prosecution. 21 O.S.2001, § 701.12(1), (4), (5), and (7).

¶ 105 In Proposition Fourteen, this Court found the evidence insufficient to support the jury's finding of the heinous, atrocious, or cruel aggravator. Recently in *Brown v. Sanders*, —— U.S. ——, 126 S.Ct. 884, 163 L.Ed.2d 723 (2006), the Supreme Court set forth a new rule and held that an invalidated sentencing factor will render a death sentence unconstitutional by reason of its

> adding an improper element to the aggravation scale in the weighing process *unless* one of the other sentencing factors enables the sentences to give aggravating weight to the same facts and circumstances.... If the presence of the invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it, due process would mandate reversal without regard to the rule we apply here. The issue we confront is the skewing that could result from the jury's considering *as aggravation* properly admitted evidence that should not have weighed in favor of the death penalty. As we have explained, such skewing will occur, and give rise to constitutional error, only where the jury could not have given aggravating weight to the same facts and circumstances under the rubric of some other, valid sentencing factor.

(citations and footnotes omitted) (emphasis in original). *Id.*, 126 S.Ct. at 892. All of the evidence relating to the abduction, rape and the murder itself was admissible evidence for another purpose—to show the sheer callousness of the crime in support of the continuing threat aggravating circumstance. Because the facts and circumstances that the invalidated aggravator permitted the jury to consider were "also open to their proper consideration under one of the other" aggravators, the erroneous aggravator could not have skewed the sentence, and no constitutional violation occurred. *Id.*, 126 S.Ct. at 893.

¶ 106 The rule pronounced in *Brown* does not, in our opinion, replace the need for reweighing the aggravating and mitigating evidence when a weighing state invalidates one of the aggravating circumstances. As the dissent in *Brown* notes "the potential for the same kind of constitutional harm exists in both kinds of States, namely that the jury will attach special weight to that aggravator on the scale, the aggravator that the law says should not have been there." *Brown*, Breyer, J., *dissenting*, 126 S.Ct. at 899. Accordingly, when this Court invalidates an aggravator and at least one valid aggravating circumstance remains which enables the jury (or the judge in a bench trial) to give aggravating weight to the same facts and circumstances which supported the invalid aggravator, it will continue to reweigh the evidence and uphold the death sentence if the remaining aggravating circumstances outweigh the mitigating circumstances and the weight of the improper aggravator is harmless. *Clemons v. Mississippi*, 494 U.S. 738, 741, 110 S.Ct. 1441, 1444, 108 L.Ed.2d 725 (1990); *Valdez v. State*, 1995 OK CR 18, ¶ 73, 900 P.2d 363, 384. We may find an improper aggravator to be harmless error if, looking at the record, the Court finds that the elimination of the improper aggravator cannot affect the balance beyond a reasonable doubt. *McGregor v. State*, 1994 OK CR 71, ¶ 48, 885 P.2d 1366, 1385–1386. This "independent reweighing of aggravating and mitigating circumstances where one of several aggravating circumstances has been invalidated is implicit to our statutory duty to determine the factual substantiation of a verdict and validity of a death sentence." *McGregor, id.*

¶ 107 Three aggravating circumstances remain: (1) the Defendant was previously convicted of a felony involving the use or threat of violence; (2) the existence of a probability that the Defendant would commit criminal acts of violence that would constitute a continuing threat to society; and, (3) the murder was committed for the purpose of avoiding arrest or preventing a lawful arrest or prosecution. The evidence offered in support of each of these remaining aggravators was substantial.

¶ 108 The State presented evidence which showed Myers had been previously convicted of assault with intent to commit rape, murder and possession of a firearm

after a felony conviction. This evidence was more than sufficient to prove Myers was previously convicted of a felony involving the use or threat of violence. *Williams*, 2001 OK CR 9, ¶ 130, 22 P.3d at 732.

■■ ¶ 109 Evidence of the prior violent felony convictions, plus evidence of Myers's prior unadjudicated acts of violent conduct towards his step-daughter, and evidence showing the sheer callousness of the murder, was all compelling evidence supporting the continuing threat aggravator. *Young*, 2000 OK CR 17, ¶ 78, 12 P.3d 20, 42.

■■ ¶ 110 Lastly, in support of the avoid arrest or prosecution aggravator, the State's evidence showed Myers abducted Shawn Williams and took her to a secluded place where he physically and sexually assaulted her and killed her. *Carter v. State*, 1994 OK CR 49, ¶ 49, 879 P.2d 1234, 1250 (this aggravator requires a predicate crime, separate from the murder, for which the defendant seeks to avoid arrest or prosecution). Bonnie Makin testified about the sexual assault Myers committed against her, for which he was prosecuted and convicted. After the assault, which Myers committed in a secluded area, Myers drove Makin to town and told her if she told anyone, he would "finish it off." From this evidence, the jury could properly conclude Myers killed Williams to avoid arrest and prosecution for the crimes he committed against her.

¶ 111 Myers called three mitigation witnesses. Dr. Phillip Murphy, a clinical psychologist, evaluated Myers and testified his IQ scores placed him in a borderline range— between normal functioning and mentally retarded functioning. His performance IQ was much higher than his verbal IQ, which was consistent with his dyslexia and aphasia. Murphy testified Myers has severe deficits in language reception and expression and other neurological testing showed he has moderate to severe brain damage most likely caused from a head injury he suffered when he was eight years old.

¶ 112 Myers's case manager at DOC testified Myers had not had any disciplinary problems while at the Oklahoma State Penitentiary.

¶ 113 Myers's sister, Hazel Robitaille, described their childhood. When she and Myers were young children, her mother and father split. Her mother's boyfriend lived with them for about one year; he was very abusive to Myers—physically and emotionally. Robitaille said Myers was hit by a car when he was about eight years old. He was running away from some children who were teasing him and when he ran into the street, he was hit by a car. He was in the hospital for a very long time and was in a coma. When he finally woke up, he was withdrawn and wouldn't talk to anybody. When he returned to school, he did not do well. The other children always teased him and treated him like he did not belong. He often got in fights and even the teachers ridiculed him. Their mother remarried another man who also was abusive towards Myers. Robitaille recalled one time when this man (Garinger) urinated on Myers's head. After their mother and Garinger split up, another boyfriend (Lake) also was abusive toward Myers. He used make Myers pick up cow patties and once tried to run over him. Robitaille testified she loved her brother and would continue to remain in contact with him even if he spent the remainder of his life in prison.

■■ ¶ 114 Although the mitigating evidence was uncontroverted, it was not overly compelling or unusually persuasive.[10] The

---

10. The jury was instructed in Instruction No. 38 that Myers had introduced evidence of the following mitigating circumstances: (1) Myers suffers from a low I.Q.; (2) Myers suffers from brain damage; (3) Before suffering a severe automobile accident as a small child which left him in a coma for a period of time, Myers was a normal, outgoing child; (4) As a child and adolescent, Myers was subjected to extensive emotional, psychological, and physical abuse at the hands of various father figures; (5) In school, Myers was ostracized, ridiculed, and emotionally and physically abused by other students and teachers because of his low intellectual functioning; (6) Myers has been a loving brother to his sister, Hazel Robitaille, and her family, helping out whenever he could; (7) Hazel Robitaille, Myers's sister, loves him and would continue to contact him if he is sentenced to spend the rest of his life in prison. Myers life has meaning to his sister; (8) If not executed and sentenced to life imprisonment without the possibility of parole, Myers will spend the rest of his life in custody; (9) Myers functions well in the secure environ-

evidence supporting the aggravating circumstances was strong. Upon reweighing the remaining valid aggravating circumstances against the mitigating evidence, we find the aggravating circumstances outweighed the mitigating evidence and supported the death sentence. Had the jury considered only these valid aggravating circumstances, we find beyond a reasonable doubt the jury would have imposed the same sentence of death.

¶ 115 Upon review of the record, we are satisfied that neither passion, prejudice nor any other arbitrary factor contributed to the jury's sentencing determination. After carefully reviewing the evidence presented, we also find that it supported the jury's finding of the three valid aggravating circumstances.

¶ 116 Finding no error warranting reversal or modification, Myers's Judgment and Sentence is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch.18, App. (2006), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

CHAPEL, P.J. and LUMPKIN, V.P.J.: concur.

ment of prison, has not misbehaved, gives no trouble to other inmates. This instruction also advised the jurors that "in addition, you may decide that other mitigating circumstances exist, and if so, you should consider those circumstances as well."